## CHANDLER *v.* POMEROY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEW JERSEY.

No. 1343. Submitted November 17, 1891. — Decided February 29, 1892.

In order to justify a court in refusing to enforce a settlement of a quarrel between the members of a large family, growing out of disputes about the wills of their father and other members of the family, and out of money transactions between brothers and sisters, upon the ground that the settlement was obtained by misrepresentation, active or covert, or that it failed to express the real intent of the parties, the testimony should establish the fact clearly and satisfactorily; and in this case it is not so established.

THIS was a bill in equity filed September 4, 1888, by the appellant Chandler, as executor and trustee under the last will and testament of George P. Pomeroy, deceased, against Josephine Pomeroy, Julia Pomeroy Morrison, her husband, William F. Morrison, and Alfred Mills, surviving executor of the last will and testament of George Pomeroy, father of the said George P. Pomeroy, to enforce a certain agreement of settlement between George P. Pomeroy and his sisters, devisees of the estate of George Pomeroy. The bill was subsequently dismissed as to the defendant William F. Morrison, and about

the same time Eugene C. Pomeroy, son and heir at law of George P. Pomeroy, appeared by his guardian and asked to be made party complainant, if the court should deem it necessary or desirable, but no order appears to have been entered making him a party.

The case arose out of the following facts: George Pomeroy, of Madison, N.J., died June 24, 1880, leaving a will, dated July 22, 1875, and an estate valued by him a few months before his death at $893,000, consisting of personal property estimated to be worth $538,000, and lands in New Jersey, New York and Missouri valued by him at $355,000. The personal estate, however, when inventoried was appraised at $480,000. His family and heirs at law then consisted of his wife, Abba S., and four children, George P., Edward, Julia and Josephine. His will was duly probated at Morristown, N.J., and letters testamentary issued to Edward Pomeroy and Alfred Mills, who were appointed in the will as his executors. Edward Pomeroy died March 6, 1887, whereby Mills became, and still is, sole executor.

The estate of George Pomeroy was disposed of under his will as follows:

*a.* The executors were authorized to deliver to the New York Life Insurance and Trust Company securities to the amount of $50,000, to be held in trust for the benefit of his wife during her life, and upon her death to divide the securities and proceeds equally between the three younger children, Edward, Julia and Josephine. His wife died in February, 1883.

*b.* Securities to the amount of $30,000 were directed to be deposited with the same company, to be held in trust for the benefit of his son, George P., during his life, and at his death such securities and the proceeds thereof were also to be divided among the three younger children. George P. Pomeroy subsequently married Harriet Cowles, of Cleveland, who died after giving birth to a son, Eugene C. Pomeroy. George P. Pomeroy himself died in November, 1887.

*c.* The testator directed that no partition or sale of his real estate should be made until his executors should have sold

real estate to the amount, of at least, $100,000; and further directed that the proceeds of the first of such sales should be deposited with the same company until the amount should reach $100,000, which should be held and invested for the benefit of his two daughters, Julia and Josephine, with instructions to collect and pay to each of them the interest on $50,000, and in case of the death of either of them without issue to pay such trust fund in equal shares to his son Edward and his other daughter, and the survivor, (if one of them be dead,) the issue of said Edward and of said other daughter representing their parents respectively.

*d.* The residue of the estate, aside from some immaterial legacies, was devised to his three younger children, Edward, Julia and Josephine, in equal parts. It was provided that the homestead at Madison, N.J., should be kept up by the three younger children so long as they and the widow could live harmoniously together, etc.

As between the two executors, Edward Pomeroy took charge of the personal assets of the estate. As directed by the will, the trust fund of $50,000 for the benefit of the widow, and that of $30,000 for the benefit of George P., were established by placing with the New York Life Insurance and Trust Company the requisite securities.

George P. Pomeroy had been trained for public life, and was abroad most of the time, engaged in the foreign diplomatic service of the United States. During his absence a quarrel arose between Edward and his sisters Julia and Josephine, in which the latter claimed that he had wasted their estate, and was indebted to them in the aggregate amount of $252,000. To recover this amount the sisters brought suit against Edward in one of the courts of New York. In that suit they charged that Edward had speculated in stocks with the funds derived from the estate of his father, and had made large profits in which they should share, and had suffered losses with which they should not be charged. Prior to this suit, however, and in February, 1885, he turned over to each of them securities to the amount of $50,000, besides some small annual payments in cash.

That suit was still pending when Edward Pomeroy died; on March 6, 1887, leaving a will, in which, after making some small legacies to the amount of $6500, he devised his entire estate to his brother George, and made him sole executor. His will was duly admitted to probate May 2, 1887. George P. Pomeroy declined to act as executor, and Frank R. Chandler, the plaintiff, was appointed administrator with the will annexed.

Shortly before Edward's death, namely, February 24, 1887, George P. Pomeroy, then living in Paris, executed a will leaving his entire estate to his infant son Eugene, then about seven years old; but in case he should die before reaching the age of 21 years and without leaving issue him surviving, the estate was to go 'to Mrs. Martha E. Buckingham and her daughters, Mrs. Chandler, plaintiff's wife and Rose A. Buckingham, and to the survivor of them, Mary E. Van Aulen and Frank R. Chandler. Upon certain contingencies Chandler was to become executor of this will.

When Edward died his brother George was in Europe; plaintiff Chandler was his business agent in America, and had had general charge of his affairs for some years. Very soon after Edward's death Chandler entered into negotiations with the sisters for the purpose of bringing about a settlement of the controversy between them and himself as the administrator of Edward's estate, and in connection with this certain cable messages passed between George and his sisters in reference to the proposed settlement, which was embodied in an agreement bearing date April 13, 1887, but actually executed May 2.

This agreement was executed at Morristown, N.J., and was signed, sealed and acknowledged by George E. Pomeroy, Julia P. Morrison, and William F. Morrison, her husband, and Josephine Pomeroy. After reciting in substance that Edward, at the time of his death, was indebted to the three younger children, or some one or more of them, to an unknown amount; that the parties desired to settle the estate of their father and their brother Edward without litigation, and to adjust the claims of the parties against Edward's

estate, suppressing and terminating the suits brought against him and pending when he died; and that they desired to vacate the provisions of their father's will in order to be equally charged with, and equally to share in, the estates of both George Pomeroy and Edward Pomeroy, and to settle said estates and determine the value of the shares of each of said heirs, they agreed in substance as follows:

1. The remainder of the estate of George Pomeroy, the father, was to be equally divided among his three living children, Julia, Josephine and George P.

2. This division to be made as of the date of the death of the father.

3. To arrive at the interest to which each should be entitled at the date of the agreement, each was to be charged with the amount he or she had received, with six per cent interest from the date of receipt to the date of the document, payable annually.

4. The estate of Edward was to be divided and distributed equally between George P. and his two sisters, after payment of his just debts and the specified legacies of $6500.

5. In case it should be found that the personal property of said George or said Edward could not be equally distributed in kind, then so much as might be necessary to be sold and the proceeds divided.

6. The real estate of said George and of said Edward, wherever situated, and by whomsoever held, to be conveyed by good and sufficient deeds so that each of the three parties should hold an undivided third thereof as a tenant in common with the others.

7. In the division of the said estate, the proceeds or revenue to be derived from the trust fund for the benefit of George P., Julia and Josephine, created by the will of their father, to be treated as a joint fund and divided equally between them, and, so far as it lay in their power, the parties agreed that the said trust fund should be considered and be the joint fund of the parties.

The bill set forth these facts in substance, and prayed for a decree declaring the settlement valid; that Julia and Joseph-

ine render an account of the property received from both estates under such agreement; and that there be a reference to a master to take such account; that the $30,000 trust fund in favor of George P. Pomeroy be delivered to him with its earnings and income; and that the surviving executor, Mills, be directed to proceed and complete the execution of the will and to pay over to the plaintiff property equivalent to the trust fund of $100,000 in favor of Julia and Josephine; and for a receiver.

The answer of Josephine and Julia denied that, in any of the proceedings preceding the execution of the settlement, any suggestion or mention was made that the several trust funds provided for in the will, the $30,000 for the benefit of George P., or the two funds of $50,000 each for the benefit of the defendants Julia and Josephine, should be included therein; and that nothing was at any time said which led them to suppose that said trust funds were to be included in the proposed settlement; nor was any mention made of any landed estate or of any accounting for moneys received by these defendants or Edward since the death of their father; and that the agreement was signed without consulting counsel, upon the advice of plaintiff that they should not do so. They denied that the minds of the parties met, and averred that they never were aware that the settlement included these trust funds until after the execution of the settlement, and upon the evening of the same day, when they were informed by plaintiff of its terms; when they at once repudiated that portion of the agreement, and have always refused to recognize it as binding upon them, so far as it proposes to cover the trust funds.

A supplemental bill was subsequently filed praying for an injunction against the prosecution of a certain suit brought by Josephine in New Jersey for a partition of, or sale and partition of, the proceeds of the lands of George Pomeroy; and also of another suit brought by the sisters in Missouri for a partition of the lands of which George Pomeroy died seized. Upon the filing of this supplemental bill an injunction was granted, which is still in force.

Upon the final hearing in the Circuit Court upon pleadings and proofs, the original bill was dismissed for want of equity. (46 Fed. Rep. 533.) From this decree the plaintiff appealed to this court.

*Mr. Charles C. Bonney* for appellants.

*Mr. George W. Smith* and *Mr. John Maynard Harlan* for appellees.

I. No decree in favor of complainant was practicable.

There was by the will of the elder Pomeroy no devise to the executors. By the filling of the $100,000 fund, the power of Mills, surviving executor, was exhausted. He could not thereafter sell the unsold real property. Neither by the cable messages nor by the agreement of April 13, 1887, was the attempt made to authorize him to sell.

If then, the realty is to be converted into personalty, it must be done by or under the general equity jurisdiction of the court. The persons or class of persons who will ultimately receive or be entitled to take the principal of the $100,000 trust fund, are as yet unknown. The legacy was to the trust company in trust to pay the income of one half to Julia for life, and of the other half to Josephine for life. At the death of either, leaving issue, the principal of one-half was to go to such issue, and in default of issue to the survivor and Edward. It was a gift to survivors, at the death of a person in being, and by the established rule should take effect only at the time of such death. *Newberry* v. *Blatchford,* 99 Illinois, 11, 42.

Edward has died leaving no issue, and the sisters are living. Suppose one should die leaving issue, the issue not yet known would take. Suppose one should die leaving no issue, would the surviving sister take the whole as survivor, or would she take jointly with the heirs of Edward? Suppose both sisters should die leaving no issue of either, would their heirs take, or would the heirs of Edward share with such heirs? Is the residuary estate the subject of executory gift by either Julia or Josephine? All these are questions suggested by the

clause of the will relating to the $100,000 fund, not necessarily or perhaps even properly answerable here. Until the death of one of the sisters it is impracticable to make a rule for equalizing the distribution of this fund.

II. Chandler represented the sisters in the negotiations of 1887. His duty was to all alike, in so far as to see that all alike understood what they were doing, and that neither was misled or deceived. The obligation rested upon him at the hearing to show that in all respects he had fully and fairly performed his duty. The burden of proof was on him to show that the supposed contract was free from the bias of his personal influence, and that there was no mistake or misapprehension of its terms on the part of either of the sisters. How far he came short of complying with the well founded and well known rule in this regard, the evidence will show.

III. The question must be dealt with as primarily one of business, with enough only of sentiment in it to dispose the parties to a settlement upon a reasonable basis. If, in view of all the circumstances at the time, the agreement was executed — in view of the position of vantage the sisters held, and that of disadvantage George P. held, in view of the scope of the controversy then to be settled, and of the conduct of the parties, including Chandler, it appears that the agreement is in-equitable, that there is no equality in it, as that term is properly used, then this court will not reverse the decree of the lower court refusing specific enforcement. Before a court of equity will grant such relief it "must be satisfied that under all the circumstances it is equitable to give more relief than the plaintiff can have at law." *Marquis of Townshend* v. *Standgroom,* 6 Ves. 328, 332.

In this connection counsel adverts to the fact that no cross-bill has been filed, apparently thinking the failure to ask for an annulment or alteration of the agreement militates against the defence here by appellees. But the point is not well taken, for the sufficiency of appellees' defence to appellants' prayer for affirmative relief does not depend upon whether upon a cross-bill or original bill, appellees could have had the odious provisions of the agreement annulled. *Mortlock* v. *Buller,* 10

Ves. 292, 307; *Cathcart* v. *Robinson*, 5 Pet. 264, 276; *Hennessey* v. *Woolworth*, 128 U. S. 438.

IV. The agreement contemplated a division of the income only, during the joint lives of the parties.

V. George P. Pomeroy had an advantage in the distribution in 1887.

MR. JUSTICE BROWN, after stating the case as above reported, delivered the opinion of the court.

This case turns solely upon the question whether the settlement or compromise of May 2, 1887, between the sisters Julia and Josephine and Mr. Chandler, the representative of their brother's estate, was executed under such circumstances as to call upon a court of equity to enforce its specific performance. This involves the subordinate question whether the sisters were imposed upon in giving their assent to this settlement.

Some years before its execution a quarrel had arisen between Edward and his sisters, which had culminated in a suit brought by the latter, in which they had charged their brother with speculating in stocks with the funds derived from their father's estate, and with having made large profits in which they ought to share, and suffering losses with which they ought not to be charged. This suit had intensified the bitterness felt by Edward to such a degree that, in making his will, which was executed October 23, 1886, he left his entire estate, less a few legacies amounting to $6500, to his brother George, making him also his sole executor. This will only served to complicate matters still more, as Edward had never settled with his sisters for their share of his father's estate, and was also thought by some to have made a large fortune in speculations in which his sisters would have been entitled to share, in the absence of a will. Their brother George had received under the will of their father only the income of $30,000, with a proviso that, at his death, the principal should go, not to his children or heirs, but to his younger brother and his sisters — an inheritance far less than he would have received had no will been made. Thus Edward, in bequeathing to his brother

George his interest in his father's estate, gave him but little more than he would have received under the natural laws of inheritance, but in giving him his own estate, which was thought to be very large, he ignored his sisters altogether. Under this state of facts there was nothing unnatural in the suggestion that the estates of the father and Edward should be added together and divided equally among the three surviving children. If it had turned out that Edward had made a large fortune it might have been an advantage to his sisters to share in it; if not, Julia and Josephine would at least have obtained a settlement of their suit with the estate, and have admitted their brother George to his natural inheritable share of his father's estate. From a fraternal point of view it was not an unwise proceeding, although from a pecuniary standpoint it was, as characterized by one of the witnesses, "a leap in the dark."

Edward died March 6, 1887. His brother was in Europe, and his sisters in New York. The first suggestion of a settlement came immediately after Edward's death, from a Mr. Chapman, who had been a neighbor of George Pomeroy in Morristown, and acquainted with the sisters for twenty-five years. He went to their hotel the very day of Edward's death, and met the two ladies, Mr. Morrison and Mr. Cowles, and made a proposition to divide the securities, making no mention in his conversation of the trust funds created by the father's will. His own statement of the proposition is as follows: "Now, says I, I will make a proposition: 'Let bygones be bygones; let's take the thing as it stands to-day; put the securities all into a hat and shake them up and divide them into three parts — George one-third, and the girls each one-third; that would settle the whole difficulty. Whatever Ed. has lost, let it come out of the girls' share, if he had lost any, if he had lost more than he had made; but to settle it up and divide it into three parts, but to start as it stood to-day.' That was the proposition — all I had to say about it. . . . Not a word" was said in regard to trust fund or back charges. "There couldn't have been anything said about back charges, for my proposition was to take the things as they stood then;

let all that Edward lost and all that go, and just start in and take the securities and things as they stood then and divide it, so there couldn't have been anything said in regard to any back accounts that they had, and as to the trust fund there was no question or nothing. . . . My understanding was that they " (the sisters) " approved of it, and so did Mr. Cowles." In narrating a subsequent conversation with Mr. Chandler in regard to this, he testifies : " I merely said ' I said nothing when I made the proposition about the trust funds, from the fact that I didn't suppose the girls had any right to the trust funds.' " He again testifies : " Every one agreed to it, and, as I say, I thought the girls would be the loser by a small amount, but then I looked upon it that they had better lose a few thousand apiece than to be running after lawyers any longer. They had been hampered with lawyers a good while and worried to death, and I felt it was better for them."

It seems that Mr. Cowles, who was the father-in-law of George P. Pomeroy, also advised an ending of the litigation, and a division of whatever was left equally among the three. Mr. Morrison, Julia's husband, testifies : " ' Whatever was left ' we understood as what was left by the father of the father's estate ; also in the sense of what was left from the speculations that Edward had made, perhaps the wreck of the estate ; whatever there was, large or small, as matters then stood. . . . Mr. Cowles said that he was going right over to Paris, to London at least ; that he would see George and urge this upon him." Very soon after that Mr. Cowles left for Europe. Shortly after the death of Edward, and on March 12, Julia wrote to her brother, who was abroad, urging him to return home at once and attend to the probating of the will, and watch his own interests. Regarding the proposed settlement, she wrote as follows : " Now, I have a proposal to make to you. Suppose we do away with all lawyers in the settlement of our affairs, for they expect $50 or $100 every time they look at you. You appoint Frank Chandler, who is unquestionably your friend ; we appoint Mr. Morrison, who is undeniably a friend to both parties. Let nothing be binding. Frank and my husband are both capable and honest men. Let

them look over the securities together in our presence and try and settle between yourselves. We will avoid expense by so doing; but this we can discuss when you return. I only speak of it now so that you can reflect upon it at your leisure. You have, of course, seen and talked with Mr. Cowles by this time, and you know you inherit all of Edward's personal and real estate, excepting a few legacies. My advice is to get your property and enjoy it while you live, and to let all wrangling cease, which diminishes the capital, puts every one in hell," etc.

The next day Mr. and Mrs. Morrison went to Newport, leaving their sister Josephine in New York. While at Newport a correspondence was opened between Chandler and Mrs. Morrison, which is not all produced, although Mr. Chandler states the substance of his own letters to have been that the three children, Julia, Josephine and George, were to receive, past, present and future, exactly the same, and in the adjustment as to the time of receiving to be equalized on a six per cent basis for money.

On April 6, however, Julia writes to the plaintiff from Newport as follows: "I am willing to agree to your plan of settlement, and promise you now to do so. But how about the trust fund? Do you mean to cancel that and George's thirty thousand trust fund, too, and lump all together? This we would prefer, as our trust fund will only yield each $1500 or $1800 a year. George gets more on his $30,000 than we would on $50,000. I am afraid that Mr. Mills will not let us relinquish this in behalf of the estate. He wants his commission. What are we to do about this?" A few days afterwards, on April 13, she writes him as follows: "Josephine and I are willing to settle this matter as you propose unless we find there is but a small estate left  In that case I think we should be allowed to keep the trust fund in excess, in order to make up in a measure for Edward's speculative transactions with our money. This, I am sure, you will consider fair. If the estate is large, as it ought to be, we can lump all together and share alike." About the same date Josephine writes a letter to her aunt, Mrs. Van Aulen, which contains the following: "I am awfully

afraid Edward was poor; but if we are willing to sign this agreement, so as to stop all litigation, we will not go back on it. Why should George wish to be richer than we, or we wish to be richer than him?" The plaintiff also had some correspondence with Josephine. Before going to New York, and in pursuance of this correspondence, Mr. Chandler had the proposed settlement drawn up in the form in which it was afterwards signed, by one Gill, a lawyer of Chicago. It was drawn up in triplicate on the 7th or 8th of April, and dated the 13th, though it was not actually signed until May 2. Upon his arrival in New York, which was on April 11, he called upon the sisters at a house upon Madison avenue, and testifies as follows regarding the interview: "I requested that they should take that agreement to their counsel who was conducting the litigation against their brother Edward. They consented to do so. The next day, after our first interview, they were to go with me to see Hill, Wing & Shoudy, their attorneys in William street, and consult with them. I told them they should not under any circumstances settle the suit against Edward without consulting with their counsel in regard thereto, or to sign this agreement that I proposed." He further swears that the ladies being ill, he went to Mr. Shoudy's alone, and showed him the document; that he read it over, and said he would like to retain it over night, and the next day he would be able to tell Mrs. Morrison what she had better do; that Mrs. Morrison went down with him the next day and found Mr. Shoudy in the office; leaving Mrs. Morrison there he went out for a short time, and soon returned and asked what the result of the consultation was. To use his own language: "Mrs. Morrison spoke up and said: 'Mr. Shoudy says we are taking a great leap in the dark, but nevertheless we will settle. We will carry it out. We will make the settlement.' At that time Mrs. Morrison gave her acquiescence in my plan of settlement, and Josephine, whom we saw afterwards, approved of it also. The difficulty then was to get their brother George to give his consent. Although I had authority to act generally for him, I did not feel that I could sign such an important settlement, which involved a very large sum of money, without positive

and direct instructions.". Josephine says of the interview on Madison avenue, before the visit to Shoudy's office: "Mr. Chandler called one morning with my aunt, Mrs. Van Aulen. . . . After that Mr. Chandler took out a paper from his pocket — I think about two sheets — and said he wanted to read us a few lines of what he had jotted down on his way from Chicago — his plan of settlement or proposal. I told him I was too ill to listen to him; I could scarcely sit up — hold my head up — but he insisted on my staying; so we listened to him reading it through, and it was very ambiguous; and when he finished, I said, 'Frank, I don't understand that.' It was very ambiguous. Then my sister said, 'Does it mean to divide up what is left?' He said, 'Yes; it means that.' That was all that was said on the subject of business at that interview."

Chandler remained in New York for a week, seeing the sisters almost daily, and, in order to obtain the consent of George, who was then in Europe, made use of the cable, and the following telegrams passed between the parties. As these telegrams constitute an important part of the correspondence they are reproduced in full:

"New York, April 15, 1887.

"To Chandler, sixty-three Pierre Charron, Paris.

"Power received. Doubtful value. Have George sign cablegram himself, authorizing settlement equal division father's, brother's estate, *including the trusts*, and renouncing executorship, if necessary. Mary and I advise settlement before Edward's condition known. None seeking advantages, but peace, equality. No confidence in us; get somebody else.

"(Signed)          FRANK."

Chandler, who produced this cablegram, explained the address as meaning his family's apartment in Paris, where Mr. Cowles and Mr. Pomeroy then were, and the contents of the telegram by saying that the settlement was based upon a principle and not upon a result. "I felt that if Edward's estate proved very small the sisters would not settle; if it proved very

large, the brother would not settle." It is at least doubtful whether the sisters ever saw the telegram. To this telegram the following answer was received:

"Paris, 4, 17, 1887.

"To Frank Chandler, St. James Hotel, New York.

"No litigation. Will allow sisters just rights on arrival thirtieth. Please arrange all other important business. Address American Exchange, London.

"(Signed)          GEORGE POMEROY."

To this he replied as follows?

"To Pomeroy.

"Dispatch unsatisfactory. You don't understand situation. Return Chicago Tuesday. Henceforth manage your own affairs.          (Signed)          FRANK CHANDLER."

On April 19, Pomeroy telegraphed from London to his aunt, Mrs. Van Aulen, as follows:

"London, April 19, 1887.

"To Van Aulen, 675 Fifth Avenue, New York.

"I accept proposition to share equally with sisters in father's and Edward's estates, *including all trust funds.* Legal expenses both sides and Edward's debts to be paid out of joint estate."

Upon the same day the three ladies cabled Mr. Cowles as follows:

"Edwin Cowles, American Exchange, London, Eng.

"Proposition accepted by us, but George must come home immediately. Frank cannot act without him; losing money. "(Signed)          JULIA and JOSEPHINE and VAN AULEN."

Upon the same day Mr. Cowles cabled as follows to Mrs. Van Aulen:

"George cables acceptance proposition. I have a duplicate with his signature. He will act good faith. He is ill, not fit

to travel alone; cannot he wait till I sail May 7th, wants to finish medical treatment; answer immediately American Exchange, as he leaves morning Germanic.

"(Signed)            COWLES."

Upon the same day Julia also telegraphed to Mr. Chandler, who had returned to Chicago, as follows:

"New York, 19.

"To Frank B. Chandler, 110 Dearborn Street, Chicago, Ill.

"George accepted terms; he arrives next week; will write you in full."

She also wrote him a letter of same date, enclosing copies of the telegrams from Cowles and George P. Pomeroy and the replies to them. About the 30th of April Mr. Chandler returned from Chicago to New York, and went a day or two afterwards to Morristown, where he met George P. Pomeroy, who in the meantime had returned from Europe, and the sisters. They went directly to the office of Mr. Halsey, an attorney at that place, where the agreement was signed. At the same time the will of Edward Pomeroy was admitted and proved. George P. Pomeroy renounced the executorship, and Mr. Chandler qualified as administrator with the will annexed. In the interview at Mr. Halsey's office something seems to have been said to the effect that the trust funds could not be touched. But it seems to have been only an incidental remark, not assented to by Mr. Chandler, probably not heard by him, as he was deaf, and not made the subject of discussion. That evening there was a meeting of the parties at their house in Morristown, when the agreement was read, its contents explained by Mr. Chandler, and, as the sisters now claim, the agreement with regard to the back charges and trust fund was first called to their attention. The interview was evidently a stormy one, the sisters threatening to repudiate the agreement, and insisting that they were dividing up what was left; that if he ever attempted to force this he could only do it by law through the courts; and that they did not know it was in the agreement or anything about it. Mr. Chandler insisted

that, as they had signed it, they were bound by it. He claims, however, that the only dispute was with regard to the interest and the method of making an accounting, and it is proven that the following memorandum was made and handed to him that evening or soon after:

" To F. R. Chandler.

" SIR: In figuring interest on the accounts in accordance with the agreement of April 13th, 1887, it is understood that interest shall be figured to May 1, 1887, and all sums that come between the 1st and 15th of any month shall be called to the first of that month, and between the 15th and 30th of any month, then to the 1st of the following month."

This was signed by George P. Pomeroy and the sisters.

Conceding that the sisters had not read the agreement or demanded that it be read to them before they signed it, as they were bound to do, and that their counsel, Mr. Shoudy, had not informed them of its terms as fully as he might have done, it is difficult to see how, in view of the telegrams between the parties in New York and those in Europe, and their own letters, they could have understood that the trust funds were not included, if they understood the force of language. Not only did George's telegram, a copy of which Julia enclosed in her letter of April 19 to Mr. Chandler, expressly mention "all trust funds," but it was also mentioned in the original telegram from Chandler to Mr. Cowles of April 13, of which she probably knew the contents, and her reference to it in her two letters from Newport of April 6 and April 13, puts it beyond controversy that the propriety of including the trust funds was made a matter of discussion. Their conduct subsequent to the agreement tends strongly to show their acquiescence in it. On the 9th of May they executed a power of attorney to Chandler to settle and dismiss their suits in Missouri and to take charge of their property there. Upon the same day they executed a bond reciting their authorization to him to make a distribution of the estate of Edward Pomeroy, and to pay it to the legatees and devisees named in

his will, and agreed to indemnify him against any debts which should be recovered against the estate. On the following day Mrs. Morrison writes to her aunt, Mrs. Buckingham, expressing her pleasure at the settlement of their troubles, "since we have signed an agreement to *wipe out all wills* and divide what is left, share and share alike. Frank will charge us with all our personal expenses since father's death, which is perfectly proper, but he only proposes to charge George with what he received from the trust fund left him by father, and not one cent of all the surplus he got out of mother and of you for mother's effects."

During th summer an active correspondence was carried on between Mr. Chandler and the two sisters with relation to the settlement of the estates upon the basis of their agreement, in which repeated allusion was made to the trust fund and to an equal division of the income of the same, and no suggestion on the part of either party that they were not understood to be included. Julia repeatedly expressed her pleasure that the settlement had been effected, and at the manner in which Mr. Chandler was proceeding to wind up the estates. Not only this, but the parties proceeded so far in the execution of the settlement that the two ladies turned over to the plaintiff securities to the amount of $109,153.33, to which were added the estate of Edward Pomeroy, ($190,-000,) that of George Pomeroy, ($119,000,) and the insurance upon the life of Edward in the amount of $8000, and a dividend declared in securities of $73,896.67 to each of the defendants, in addition to a cash dividend of $54,000 to each. The defendants also received from Mr. Chandler two-thirds of the income collected July 1, 1887, from the life insurance and trust company on the $30,000 trust fund of George P. Pomeroy, *i.e.* that proportion dating from May 1, according to the agreement of settlement. They also paid over to him one-third of the income for the same period of their own trust fund of $100,000. Indeed, their relations seem to have been of the most friendly description until the death of George in November. When the contents of his will were made known this controversy arose.

We have searched the record in this case in vain for evidence that the plaintiff brought about this settlement by any fraud, misrepresentation or undue influence. Undoubtedly the defendants had confidence in Mr. Chandler's integrity, his knowledge of business, and his acquaintance with these estates; it is possible that he was better informed of the amount of Edward's estate than they, but there is nothing to indicate that he made use of this information to deceive them as to its value. Their motive in entering into this agreement was doubtless an honorable one. They had been engaged in a long and apparently bitter quarrel with their brother Edward over the supposed misappropriation of their father's estate. George had been, to use Mr. Morrison's own language, "practically disinherited by the father. His sisters had not broken the father's will and reinstated him. This had made George very sore. The aunt and uncle suggested and pressed upon the ladies the fact that they then had the opportunity to bring about a perfect reconciliation and peace with their brother; that if litigation was stopped and all that there was divided up equally among the three, what was left, that this desirable result would probably be accomplished." The sisters had themselves been excluded from Edward's will, and there was at least a possibility that his estate would be large enough to make an equal division of both estates advantageous to them. Under these circumstances, and for the sake of peace, they agreed to the settlement. If equality be equity, we see no reason why it should be disturbed. From a financial point of view the agreement may have been a mistake. They acted, however, not without deliberation, and with at least an opportunity of consulting with counsel and with Mr. Morrison, in whom they seem to have perfect confidence. But if the venture turned out unfortunately for them, it is difficult to see in what particular plaintiff was to blame.

Much stress was laid by the court below upon the fact that Mr. Chandler advised the sisters not to consult with a lawyer with regard to the proposed settlement. This was strenuously denied by Chandler; but whether this be so or not, it is evident that the first proposal not to consult with a lawyer came

from Julia herself in her letter of March 12 to her brother George, in which she makes the distinct proposal to "do away with all lawyers." But at any rate, the fact is indisputable that they did consult their counsel, Mr. Shoudy; and that the plaintiff accompanied them to his office, and handed him a copy of the agreement, which he retained over night, although Mr. Shoudy testifies that his advice was not sought as to the propriety or advisability of the agreement. He seems, however, to have made no objection beyond the suggestion "that it was a leap in the dark," and if the defendants had any doubts themselves about its propriety, they should have consulted him upon the subject.

Reliance is also placed upon the frequent use, both in the correspondence and in the oral testimony, of the words "dividing up what was left." These words are, however, susceptible of two constructions; they may refer, as contended by the defendants, to the residue of the estates after laying aside the trust funds; or they may refer to what was left over and above what the children had spent or Edward had lost, if any, in speculation. Indeed, these words are so ambiguous as to be an unsafe guide in ascertaining the actual intent of the parties.

In order to justify the court in refusing to enforce a family settlement of this kind upon the ground that it was obtained by an active or covert misrepresentation, or that it failed to express the real intent of the parties, the testimony should establish the fact clearly and satisfactorily. In this case, however, all or nearly all the written testimony tends to corroborate rather than to impeach the agreement, and it is only by resort to oral evidence of facts asserted by one party and denied by the other that any doubt whatever is thrown upon the intent of the parties. That Mr. Cowles, who was one of the first to talk with the sisters regarding the settlement, did not suppose the trust funds were to be excluded is manifest from a letter written by him to George P. Pomeroy, March 18, before he left for Europe, in which he says: "The girls have made this proposition in order to settle the litigation: That you give up your claim to the annuity you have,

they give up their claim to the special legacy of $100,000 left them in your father's will, and that all property, landed and personal, be divided equally among all three of you." It was apparently upon the basis of this letter and his subsequent conversations with Mr. Cowles that Pomeroy cabled his acceptance of the proposition. The letter was written after his interview with the sisters, and in all probability he stated the agreement as he understood it from them. He would scarcely have ventured to impose upon George by manufacturing a different story. Under the circumstances it seems to us very improbable that the parties could have contemplated that securities to the amount $130,000, worth $142,000, should be withdrawn and not taken into account in the division, or that George would ever have consented to the agreement with that reservation.

We do not find it necessary upon this appeal to put a construction upon this agreement, to determine whether it applies to the principal as well as the income of the trust funds, or whether in this suit the court may proceed to a partition of the real estate. These questions will arise more properly upon the settlement and enforcement of the decree. It is sufficient for the purposes of this case to hold, as we do, that the settlement was a valid one, and that the defendants should be required to account in accordance with the prayer of the bill.

*The decree of the court below will be reversed and the case remanded, with instructions to enter a decree for the plaintiff, and for further proceedings in conformity with this opinion.*