## Richmond.

### HELEN GRAY MOORE, ET ALS. v. JAMES ATKINS GREGORY.

December 17, 1925.

1. WILLS—*Descent and Distribution—Agreement by Heirs to Ignore Will as Testator Desired—Fraud—Case at Bar.*—In the instant case, decedent had made a valid will, but, at the point of death he desired to change his will and attempted to do so but was too weak. He then before a number of witnesses stated how he wished to have his property distributed, and his wish that the will be ignored.· Shortly afterwards the heirs met and agreed to a division of the property in accordance with testator's wishes, and signed the agreement. This agreement was entered into by all the heirs without coercion or suggestion. The appellee was the youngest of the heirs and it was explained to him before he signed that the will was valid; and that, under the agreement he would take much less than under the will.

   *Held:* That the agreement was valid and binding upon the parties to it.

2. WILLS—*Descent and Distribution—Agreement at Family Meeting to Ignore Will and Make Distribution in Accordance with the Last Wishes of Testator—Equal Experience and Intelligence of the Parties—Case at Bar.*—In the instant case the heirs of a decedent in a family meeting agreed to ignore a valid will of decedent and to distribute his property in accordance with his last wishes expressed on his death bed. In this meeting there was no advantage taken or attempted by any person present; all of them stood upon equal ground with the absolute and unobstructed right on the part of each one to assent to, or disapprove of, the proceedings then in progress. While this was true, it was equally true that they were not all possessed of equal intelligence perhaps, nor of equal experience and business judgment. This, however, may be said of every gathering of the heirs of a decedent brought into family conference.

   *Held:* That these facts and circumstances, standing alone, do not constitute fraud and would not justify a court of equity in annulling a solemn undertaking entered into by parties *sui juris.*

3. CONTRACTS—*Capacity to Make Contract—General Rule.*—Generally speaking every adult person has a right to contract with respect to

his property rights, and when he has done so, courts are without authority to annul the obligations thus assumed unless they have been entered into under such circumstances as to indicate that their procurement had been brought about by fraud.

4. FRAUD AND DECEIT—*Actual or Constructive.*—Fraud may be actual or constructive.

5. FRAUD AND DECEIT—*Actual Fraud—Definition.*—Actual fraud is intentional fraud; it consists in deception, intentionally practiced, to induce another to part with property or to surrender some legal right, and which accomplishes the end designed.

6. FRAUD AND DECEIT—*Constructive Fraud—Definition.*—Constructive fraud is a breach of legal or equitable duty, which, irrespective of moral guilt of the fraud feasor, the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence, or to injure public interests.

7. FRAUD AND DECEIT—*Intent to Deceive—Actual and Constructive Fraud Distinguished.*—Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud. An intent to deceive is an essential element of actual fraud. The presence or absence of such intent distinguishes actual fraud from constructive fraud.

8. WILLS—*Descent and Distribution—Will Ignored in Favor of Testator's Wish—Actual Fraud—Case at Bar.*—The heirs of a decedent agreed without coercion or suggestion to distribute his estate in accordance with his expressed wish made on his death bed, and to ignore his will which he declared that he wished to change and would have changed except for weakness.

   *Held:* That the agreement of the heirs could not be attacked on the ground of actual fraud.

9. FRAUD AND DECEIT—*Constructive Fraud Inferred from Nature and Subject of the Bargain.*—Constructive fraud may be inferred from the intrinsic nature and subject of the bargain itself.

10. DESCENT AND DISTRIBUTION—*Wills—Agreement between Heirs to Ignore Will and Distribute Property According to Wishes of Testator— Validity.*—An agreement between the heirs to ignore the decedent's will and to distribute his property according to the testator's wishes expressed upon his death bed when he was too weak to change his will, is not prohibited by the principles of law, nor does such agreement offend against recognized rules of morality.

11. DESCENT AND DISTRIBUTION—*Wills—Family Settlement—Validity—Case at Bar.*—Where the family of a decedent believing his desires with reference to his property were not expressed in his last will and testament, and being desirous that it should descend and pass as indicated by his last utterances on the subject—his written will to the contrary notwithstanding—agreed in family conference to give validity to his last unenforceable wish, such agreement is

clearly and unmistakably a family settlement and not against public policy.

12. FAMILY SETTLEMENTS—*Consideration of Family Settlements.*—Family settlements, as they contribute to the peace and harmony of families, and to the prevention of litigation, will be supported in equity without an enquiry into the adequacy of the consideration on which they are founded.

13. FRAUD AND DECEIT—*Presumptions and Burden of Proof.*—Fraud is never presumed but must be established by strong and clear, and convincing evidence.

14. WILLS—*Descent and Distribution—Agreement Among Heirs to Ignore Will and Distribute Property in Accordance with Testator's Last Wishes—Constructive Fraud—Case at Bar.*—In the instant case the heirs of a decedent desiring to carry into effect the testator's last wishes, agreed to ignore his will and distribute the property according to those wishes. Appellee was the youngest of the heirs, and under the will would have taken a much larger share of the property than he took under the settlement. It was strongly urged that constructive fraud might be inferred from the intrinsic nature and subject of the bargain itself.

   *Held:* That unless the inadequacy of the consideration received by appellee furnished a sufficient basis for the inference of fraud, it could not be inferred from the intrinsic nature and subject of the bargain.

15. CONTRACTS—*Consideration—Inadequate Consideration.*—A contract or conveyance which is improvident, or based on an inadequate consideration, will not be set aside for those reasons alone, unless, as the rule is generally stated, the improvidence or inadequacy is so great as to furnish of itself convincing evidence of fraud.

16. WILLS—*Legatees and Devisees Renouncing Provisions in their Behalf—Family Settlements—Consideration.*—It cannot be said that a devisee or legatee under a will, who renounces its provisions in his behalf, acts without consideration, when convinced that in so doing he is observing the wish and will of the testator; and, if a family settlement needs any further or other consideration than is afforded by the mutual undertaking therein, the desire of the parties to comply with testator's wishes is sufficient.

17. FRAUD AND DECEIT—*Presumption of Fraud from the Relationship of the Parties—Family Settlement—Case at Bar.*—In the instant case the heirs of a decedent agreed to ignore his will and distribute his property according to the testator's last wishes expressed on his death bed. Appellee was the youngest of the heirs and by renouncing the provisions of the will and accepting the settlement, he suffered a very heavy pecuniary loss. At the meeting of the family at which the settlement was agreed upon, no advice or suggestion was made to the appellee that he agree to the settlement. No coercion was

applied to him, he was informed that the will was valid and by agreeing to the settlement he would suffer a severe loss. It was contended on behalf of appellee that fraud might be presumed from the circumstances and conditions of the immediate parties to the transaction; that there was lacking that absolute will which is regarded essential by courts of equity.

*Held:* That the settlement was binding upon appellee.

18. Contracts—*Right to Independent or Impartial Advice.*—The principles of the law, which insures to those whose property interests are the subject of litigation, or of disposition *in pais,* the right to independent or impartial advice, has for its purpose the enabling of such a one to know his rights, and to act in respect thereto with a knowledge of the consequences which may be reasonably expected to follow such action.

19. Contracts—*Right to Independent or Impartial Advice—Counsel—Agreement between Heirs to Ignore Will and Distribute Property in Accordance with the Last Wishes of Testator—Case at Bar.*—In the instant case the heirs of a testator agreed to ignore his last will and distribute his property in accordance with his wishes expressed on his death bed. Appellee was the youngest of the heirs, and it was insisted on his behalf that the agreement could not be sustained because he had no counsel during the negotiations. The attorney for the decedent explained to the heirs the binding and legal effect of the will. Another attorney, whether acting for appellee or not, did and said everything that could have been expected of one occupying that relation. He explained to appellee the binding effect of the will and the heavy loss he would sustain if he agreed to the settlement. Appellee acquiesced in the settlement for four years.

*Held:* That there was no merit in the contention that appellee should be absolved from his obligation because he did not have an opportunity to secure impartial advice.

Appeal from a decree of the Chancery Court of the city of Richmond. Decree for complainant. Defendants appeal.

*Reversed and remanded.*

The opinion states the case.

*Allen G. Collins, George Bryan,* and *S. S. P. Patteson,* for the appellants.

*Pollard & Smith, Julien Gunn,* and *A. Taylor Pitt,* for the appellee.

McLEMORE, J., delivered the opinion of the court.

This is an appeal from a decree of the Chancery Court of the city of Richmond, entered on October 9, 1923, and the controversy between the parties grows out of two agreements entered into between numerous heirs at law of Samuel G. Atkins, deceased, one on December 3, 1915, and one on December 15, 1915.

Samuel G. Atkins was a wealthy bachelor living in Richmond at the time of his death, November 30, 1915, and left an estate estimated by him at about $400,000.00, but which proved later to be nearer $500,000.00. He left a will written June 15, 1904, which was probated in the Chancery Court of the city of Richmond December 17, 1915, at which time the Virginia Trust Company and Henry C. Pfeiffer qualified as administrators c. t. a., Laura A. Gregory, the coexecutrix named in the will, having declined to accept the trust.

The will is in the following words and figures:

"I, S. G. Atkins, of Richmond, Virginia, being of sound mind and memory, but realizing the uncertainty of life, do make and declare this to be my last will and testament, hereby revoking all wills at any time heretofore made by me.

"First: I direct that all my just debts be paid.

"Second: I give, devise and bequeath to my sister, Laura A. Gregory, widow of James A. Gregory, late of Mecklenberg county, Virginia, the sum of twenty-five thousand dollars ($25,000.00) in fee simple, to be paid over to her by my executors hereinafter named as soon as practicable after my death, to bear interest from date of my death and to be paid in preference to all other legacies or devises herein made—and it

is my earnest advice to my sister that she will so invest this money as that it shall be absolutely safe, having greater regard for the safety of the fund than for the amount of income to be derived therefrom.

"Third: I give, devise and bequeath to my executors, hereinafter named as trustees for my niece, Helen Gray Gregory, the daughter of my said sister, the sum of twenty-five thousand dollars ($25,000.00), the same to be invested in good and safe securities and the interest dividends or income therefrom to be paid over to said Laura A. Gregory, quarterly or semi-annually, to be used and expended for the benefit of the said Helen Gray Gregory during her minority, and thereafter to be paid over to this said Helen Gray Gregory in person, and the principal thereof to be paid over to her, the said Helen Gray Gregory, when she shall arrive at the age of twenty-five years. Should she die before attaining that age the principal thereof and all income accruing therefrom after her death shall pass to her children, if any, share and share alike.

"Fourth: I give, devise and bequeath to my said executors as trustees for my nephew, James Atkins Gregory, the sum of ten thousand dollars ($10,000.00), the same to be invested in good and safe securities and the interest dividends or income therefrom to be paid over to his mother, Laura A. Gregory, to be by her expended for his education and support until he attains the age of twenty-one years, or in case of his mother's death before he attains twenty-one years of age, to be paid over to a duly qualified guardian to be expended for his education and support until he arrives at that age, and thereafter the income interest or dividends on said principal sum to be paid to said James Atkins Gregory, and the said principal sum to be paid over to said James Atkins Gregory

when he shall arrive at the age of twenty-five years, but should said James Atkins Gregory die before attaining the age of twenty-five years, the said principal thereof and all income accruing therefrom after his death shall pass to his children share and share alike.

"Fifth: I give, devise and bequeath to my aunt, Miss Rachel Atkins, the sum of twelve hundred and fifty dollars ($1250.00) in the event she survive me—but in the event of her prior death I devise the said sum to my cousin, Miss Sallie Stewart.

"Sixth: I give, devise and bequeath to the children of my deceased brother, William T. Atkins, late of Boydton, Virginia, the sum of seven thousand dollars ($7,000.00), to be divided among them as follows:

"To Mrs. Virginia Gray Reid_____$2,000.00
"To Mrs. Annie Saluda Wilkes_____ 1,250.00
"To Mrs. Fannie Bell Carson_____ 1,250.00
"To Mrs. Edith Drew Pfeiffer _____ 1,250.00
"To Dr. H. L. Atkins_____ 1,250.00

"Seventh: All the rest and residue of my estate of every nature and kind whatsoever I give, devise and bequeath to the Virginia Trust Company in trust for my said sister, Laura A. Gregory, for her life, the same to be safely invested and the interest dividends and income therefrom to be paid over to my said sister for her use and benefit, quarterly or semi-annually, during her life—and at her death the principal thereof to be divided into two unequal shares, one share of two thirds of said principal sum to be held in trust by said trustee for my said niece, Helen Gray Gregory, under like terms, conditions and limitations as are provided for in the third clause of this will, in respect to the bequest therein made, which is a bequest for

her benefit, but in case of her death before arriving at the age of twenty-five years, to her children, if any; provided, however, that if she shall have already arrived at twenty-five years of age at the date of her mother's death her said two thirds of this principal shall be paid over to her and not held by said trustee as herein provided. And the other one third of said principal sum to be held in trust by said trustee for my said nephew, James Atkins Gregory, under like terms, conditions and limitations as are provided for in the fourth clause of this will, in respect to the bequest therein made, which is a bequest for his benefit; but in case of his death before arriving at twenty-five years of age, it is a bequest to his children, if any; provided, however, that if he shall have already arrived at twenty-five years of age, at date of his mother's death, his said one third of this principal shall be paid over to him and not be held by said trustee as herein provided.

"Eighth: Should my estate, in winding up same, fall below the amount devised by the second, third, fourth, fifth and sixth clauses of this will, I direct that preference of payment in full be given to the devises made in the second, third, and fourth clauses, to my said sister, Laura A. Gregory, and her children, Helen Gray Gregory and James Atkins Gregory, over all the devises herein, and to accomplish this end that the devises in the fifth and sixth clauses of this will shall stand revoked and annulled ratably, or be entirely revoked and annulled, as may be necessary.

"Ninth: In the event of the death of either Helen Gray Gregory or James Atkins Gregory, the children of my said sister, before attaining twenty-five years of age, leaving no children living, the share of my estate devised to such deceased child of my said sister

shall pass to the said Laura A. Gregory, but if she be then dead, then it shall pass to the survivor of her said two children.

"Tenth: I hereby appoint my sister, Laura A. Gregory, and the Virginia Trust Company, at Richmond, Virginia, executors of this my last will and testament and I request that no security be required of them, or either of them, upon offering to qualify as such on my estate, or of them, or either of them, in respect to any trust devolving on them, or either of them, under this will.

"In witness whereof, I, the said S. G. Atkins, have hereto set my hand and seal this 15th day of June, 1904.

"S. G. ATKINS (Seal).

"Signed, sealed, published and declared by S. G. Atkins as and for his last will and testament in the presence of us and each of us, who at his request and in his presence and in the presence of each other have hereunto subscribed our names as witnesses this 15th day of June, 1904.

"JAS. B. PATTON
"R. L. MEAGHER
"J. BERNARD DONAHOE."

In the early morning of November 30, 1915, the decedent, realizing his approaching end, had his servants call C. T. Watkins, a nearby neighbor, and summon Dr. J. McCaw Tompkins, his family physician, to his bedside, and they together with his three servants, Bertha, uncle Ottoway and aunt Nannie were with him at the time of his death which occurred about 6:30 that morning, and about half an hour after the arrival of Dr. Tompkins.

|Decedent was entirely conscious when Mr. Watkins and Dr. Tompkins arrived, and had prior to their arrival attempted to rewrite his will. He was too weak to proceed with the task, the lines written by him being as follows: "November 30th. This is my last will, as I feel that I am dying. I desire that Virginia Trust Company and Rev. Henry C. Pfeiffer will administer my estate. I leave my niece, Mrs. A. J. Moore, one hundred thousand dollars, and my sister, Mrs. Laura A. Gregory, fifty thousand dollars and to_____"

While unable to write, he did at this time tell those present, including the servants, his wishes, particularly that his will should be revoked, and in a general way what disposition should be made of considerable of his property. A memorandum made at the time and signed by Dr. Tompkins and Mr. Watkins is here reproduced:

"November 30, 1915.

"S. G. Atkins, 6:40 a. m., dying wishes to ignore his old will. Wanted Mr. Pfeiffer and Virginia Trust Company to administer on his estate. Estate worth $400,000.00. Mrs. Moore $100,000.00 and store building. Atkins, his nephew, $20,000.00. Three nieces $10,000.00 apiece ($30,000.00). Bertha $3,000.00, Ottoway $1,000.00. His sister is to carry out his wish or he would not rest easy. Mrs. O. M. Atkins and her children $30,000.00.

"Witness, J. McCAW TOMPKINS
"C. T. WATKINS."

As to what disposition should be made of the residuum of the estate the witnesses are not in entire accord. Dr. Tompkins has no recollections about the

matter. Mr. Watkins is not asked, while on the witness stand, but several of the witnesses present on December 8, 1925 (when the family were all assembled at the residence and with them Dr. Tompkins and Mr. Watkins, also the colored servants), testify that Mr. Watkins on this occasion did state that decedent said he wanted the residue to go to Miss Helen. The colored servants stated in the presence of all the members of the family that Mr. Atkins said just before his death on the morning of the 30th that the residue should go to Miss Helen, meaning Mrs. Helen Gray Moore.

Notes were taken by Dr. Pfeiffer at the meeting of December 2nd in the presence of all the heirs, and they are as follows:

" 'Dr. Tompkins—Virginia Trust Company, Rev. Henry C. Pfeiffer, co-administrator. Mrs. Moore $100,000.00 and store building. Mrs. Gregory $50,000.00. Atkins Gregory $20,000.00. Three nieces-$10,000.00. Bertha $3,000.00. Ottoway $1,000.00.

" 'Bertha—Virginia Trust Company and H. C. Pfeiffer, coadministrators. Atkins $20,000.00. Miss Telia and children $30,000.00. Mrs. Gregory $50,000.00. Three nieces, A, G, and E, $20,000.00 apiece. Miss Helen $100,000.00 store plus residue. Did not want this disturbed. Uncle Ottoway $1,000.00. Bertha $3,000.00.

" 'Uncle Ottoway—Three nieces $20,000.00 apiece. Wanted will carried out, would not rest happy in grave if not. Mrs. O. M. Atkins and children $30,000.00. Bertha $3,000.00, Ottoway $1,000.00. Mrs. Moore $100,000.00, store and residue. Mrs. Gregory $50,000.00, Atkins $20,000.00.

" 'Aunt Nannie—Atkins $20,000.00. Miss Helen $100,000.00 and store. Miss Annie $20,000.00. Miss

Edith $20,000.00.   Miss Gray $20,000.00.   Mrs. Greg-
ory $50,000.00.   Wanted will carried out, would not
rest easy in grave if not.   Bertha $3,000.00. Uncle
Ottoway $1,000.00.   Virginia Trust Company and H.
C. P. to administer estate.   Then said "You all heard
me say this."   "Then told Ottoway to tell Mr. Watkins
to hurry up he had something to tell him."

  " 'Mr. Watkins—Said "I am perfectly rational.   I
will not be happy in my grave."   Mrs. Moore $100,-
000.00 plus store.   Atkins Gregory $20,000.00.   Bertha
$3,000.00.   Ottoway $1,000.00.   Three nieces $10,-
000.00 each.   Mrs. Atkins $30,000.00.' "

On the following morning, December 3rd, Capt.
Coke, a distinguished member of the Richmond bar,
accompanied by Herbert W. Jackson, president of
Virginia Trust Company, brought the will of decedent
to his residence, and in the presence of all the devisees
and legatees read the same, and explained to them
that it was a legal and binding will, notwithstanding
the fact that decedent had made an effort to change
same just prior to his death.

After the reading of the will in the presence of all of
the devisees and legatees by Capt. Coke, he, Dr.
Pfeiffer and Mr. Watkins withdrew to another room
in the residence and undertook to put into legal form
a memorandum of the general agreement or under-
standing which was arrived at on the night of December
2nd.   The information upon which Capt. Coke dictated
this contract of December 3rd was supplied largely
from information in the possession of Dr. Pfeiffer.   He
having been in the conference that attempted to
ascertain the wishes of the decedent, and wherein the
interested parties agreed to carry those wishes into
effect, notwithstanding the will, communicated his
understanding of the conclusions arrived at and "the

authority of the general spirit of all present" to Capt. Coke.

This preliminary agreement was prepared that morning, carried by Capt. Coke back in the assembly room, read to all of those present, and by them then and there signed.    It here follows:

"RICHMOND, VA., *December 3, 1915.*

"We, the undersigned, the relatives of S. G. Atkins lately deceased, realizing from certain memoranda left by him partly in his handwriting; but incomplete, and partly in the handwriting of others, and also according to the testimony of others present he desired that his will, made in 1904, should be changed in accordance with the aforesaid memoranda.

"We, therefore, as his relations, blood relations, are unanimous in asking that the court will treat the aforesaid memoranda as the last wishes of the deceased and will carry them out with full force and effect, to all of which we give our assent and hold ourselves bound hereby.

"Our understanding, at this time, being that the said memoranda of his wishes provides as follows:

"1.  To his niece, Helen Gray Moore, $100,000.00, one hundred thousand dollars, and the store on Cary street, Richmond, Va.

"2.  To his sister, Laura A. Gregory, $50,000.00, fifty thousand dollars.

"3.  To his nephew, James Atkins Gregory, $20,000.00, twenty thousand dollars.

"4.  To Sallie Tisdale $1,250.00, twelve hundred and fifty dollars.

"5.  To O. M. Atkins and children $30,000.00, thirty thousand dollars, ten thousand dollars for each of the three.

"6. To his nieces, Fannie Bell Carson, Annie Saluda Wilkes, Virginia Gray Reid and Edith Atkins Pfeiffer, $20,000.00, twenty thousand dollars, each.

"7. To Bertha Coleman $3,000.00, three thousand dollars.

"8. To Ottoway Gillespie $1,000.00, one thousand dollars.

"9. To Helen Gray Moore the residue of the estate.

"10. That the Virginia Trust Company and Henry C. Pfeiffer act as executors of the estate.

"Edith Atkins Pfeiffer by Henry C. Pfeiffer.

"Laura Atkins Gregory.

"Helen Gregory Moore—I sign this except in reference to Belle Carson Atkins. I think his wishes were $10,000.00 to said niece—but if the others agree, $20,000.00 is all right.

> "Helen Gregory Moore
> "James Atkins Gregory
> "Fannie Belle Carson
> "Annie Saluda Wilkes
> "O. M. Atkins and Children."

None of the parties at this time had counsel and in so far as the record discloses no one was requested or solicited to sign this agreement. It seems to have been treated by all parties as the reduction to writing of the dying wishes of the testator.

It was then understood that Capt. Coke would take this preliminary agreement and reduce it to a more formal and finished indenture. This he did by the agreement of December 15, 1925, which was in due course submitted to all the interested parties and executed by them before a notary public. This contract was signed and acknowledged by appellee on March 25, 1916, without suggestion from any person

so far as the record discloses, save Allen G. Collins, an attorney representing appellant, to whom it was submitted by Capt. Coke and some changes made therein at his suggestion. It does not clearly appear whether he (Collins) represented appellee at the time the contract of December 15th was signed or not.

That part of the last mentioned contract contained in paragraphs one and two, is as follows:

"First—That said several parties recognize, accept and agree that the said will of June 15, 1904, is under the State laws of this State the last will and testament of the said Samuel G. Atkins, deceased, and that his said estate must be administered under the provisions of said will and not otherwise.

"Second—That the said Samuel G. Atkins, on his death-bed and within two hours of his death, realizing, as he expressed, that he was about to die, desired to make a different disposition of his estate then as set forth in his will, made in his own handwriting in pencil the following incomplete memorandum to-wit:

" 'November 30th.

" 'This is my last will, as I feel that I am dying. I desire that Virginia Trust Company and Rev. Henry C. Pfeiffer will administer on my estate. I leave my neice, Mrs. J. A. Moore, one hundred thousand dollars and my sister, Mrs. Laura A. Gregory, fifty thousand dollars and to_____'

and, exhausted by this effort and being *in extremis,* his physician, Dr. J. McCaw Tompkins, understood the said Samuel G. Atkins to indicate, his voice being very weak, the further disposition of his estate written down by the said Doctor J. McCaw Tompkins, as follows, which memorandum is witnessed by the said J. McCaw Tompkins and C. T. Watkins, and is as follows, to-wit:

" 'November 30, 1915.

" 'S. G. Atkins—6:40 a. m.—dying, wishes to ignore his old will. Wanted Mr. Pfeiffer and Virginia Trust Company to administer on his estate. Estate worth $400,000.00. Mrs. Moore, $100,000.00 and store building. Atkins, his nephew, $20,000.00. Three nieces $10,-000.00 apiece ($30,000.00). Bertha $3,000.00. Ottoway $1,000.00. His sister is to carry out his wish or he would not rest easy. Mrs. O. H. Atkins and her children $30,000.00.

" 'Witness:    " 'J. McCAW TOMPKINS
              " 'C. T. WATKINS.' "

Appellee was at this time attending the institute at Blacksburg, and on March 25, 1916, Allen G. Collins, the attorney representing Mrs. Helen Gray Moore, and possibly others of that branch of the family, enclosed to Atkins Gregory a copy of the contract last above referred to, accompanied by the following letter:

*"March 25, 1916.*

"MR. JAMES ATKINS GREGORY,
    *c/o V. P. I.,*
        *Blacksburg, Va.*
"DEAR SIR:

"I enclose you copy of the agreement relating to the estate of your uncle, Samuel G. Atkins, which you will sign and return to me. You will also sign the paper on the front, instructing the trust company in the handling of the estate.

"It is not necessary for you to go before a notary public as to this copy, as you have already acknowledged the others.

"As I stated to you, you are very liberal in this

settlement, and you are giving up a large interest in the estate, but it seems to be your wish.

"The will of 1904 is a valid will, and could not be upset, but, at the same time, it appears· that your uncle desired these changes.

"Yours truly,"

On March 31, 1916, the appellee having received the letter and copy of the contract or indenture of December 15, 1915, writes Mr. Allen G. Collins, the attorney, as follows:

"*Blacksburg,, Va.,*
"*March 31, 1916.*

"MR. ALLEN G. COLLINS,
    *Richmond, Va.*
"DEAR SIR:
"Enclosed you will find papers of agreement, which I have signed and am returning to you by today's mail.

"As I have stated, I know at the time of my uncle's death he wished his will changed, and it is a great pity he could not have lived long enough to have done as he wished, but I hope and trust that we have arranged matters as near his wishes as possible, anyway I for one and I think my mother and sister can feel that we have done our best to carry out what we think was his last wishes. And otherwise, I could never enjoy one cent unless I thought this.

"Thanking you for your kind interest in the matter, I remain

·"Yours sincerely,
"JAMES A. GREGORY."

From this time until August, 1919, nothing further was done and no further transactions had· between

the parties to this cause. The terms of the agreement
of December 15, 1915, were accepted as legal and
binding by all parties, and upon all parties. The
administrators with the will annexed administered the
estate and made sundry payments accordingly.

These amounts were used by the parties to whom
they were bequeathed in the will, to discharge and
pay off the legatees as fixed by the agreement of
December 15th. Among those being paid under said
agreement was the appellee, who was to be paid
$10,000.00 of his legacy when he reached the age of
twenty-five, namely: July 28, 1919. In this settle-
ment with the trust company, who held all the securi-
ties, he was not paid the $10,000.00 in cash, but was
apparently given securities which he claims were
worth less than $8,000.00. Subsequently, on April 28,
1920, this suit was instituted for the purpose of annul-
ling and rescinding the two contracts of December 2,
and December 15, 1915, and having the appellee
restored to his rights as set out in the will of Samuel
G. Atkins of June 15, 1904.

The pleadings put in issue the validity of the con-
tracts of December 2, 1915, and of December 15, 1915,
which are in all respects regular on their face and
unassailable unless fraud, either actual or constructive,
can be shown to have existed and to have been em-
ployed in some mode offending against equitable
principles and doing violence to the recognized doc-
trines of a court of conscience.

After a careful reading of the record we think it
may be safely asserted that no fraud was employed
by any party in the preparation or causing to be
signed the contracts of December 3rd and December
15th; certain it is that appellant did nothing in fur-

therance of such a plot, but on the contrary was opposed to considering the matter at the time the preliminary contract was executed, and hesitated to sign the same as then written.

The fact that the heirs were widely scattered, and the bringing them together at a later date would be attended with considerable inconvenience, expense and delay, was the explanation given in the record of the seeming haste employed in having the meeting so soon after the burial of the decedent. This conference on December 2nd seems to have been nothing more than an effort of the members of the family, all there together, to ascertain as best they could what actually happened on the morning of Mr. Atkin's death, as none of the family were in the home at the time.

Testator had attempted on the morning of his death to revoke his will, and make a new distribution of his estate. The family had this unfinished effort before them, and were informed that after he had become too weak to proceed further in reducing his wishes to writing, he had verbally stated to those present around his bedside something of how he wanted his property to be distributed. All of his relatives were apparently anxious to know just what his wishes were, and professed not only a willingness, but a desire that his wishes be given effect. This feeling we can both understand and commend.

[1, 2] In this meeting there was no advantage taken or attempted by any person present; all of them stood upon equal ground with the absolute and unobstructed right on the part of each one to assent to, or disapprove of, the proceedings then in progress. While this is true, it is equally true that they were not all possessed

of equal intelligence perhaps, nor of equal experience and business judgment. This may be said of every gathering of the heirs of a decedent brought into family conference.

These facts and circumstances, standing alone, do not constitute fraud and would not justify a court of equity in annulling solemn undertakings when entered into by parties *sui juris.*

[3] Generally speaking every adult person has a right to contract with respect to his property rights and when they have done so, courts are without authority to annul their obligations thus assumed unless they have been entered into under such circumstances as to indicate that their procurement had been brought about by fraud.

[4] Fraud may be actual or constructive. What is actual and what constructive fraud has been defined by text writers without number, and by all of the courts of this country. The definition given in 26 Corpus Juris, pages 1060, 1061, has well epitomized the law on this subject:

[5] "Actual fraud is intentional fraud; it consists in deception, intentionally practiced, to induce another to part with property or to surrender some legal right and which accomplishes the end designed.

[6] "Constructive fraud is a breach of legal or equitable duty, which, irrespective of moral guilt of the fraud feasor, the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud. An intent to deceive is an essential element of actual fraud. The presence or absence of such an intent distinguishes actual fraud from constructive fraud."

[8] Applying this definition to the facts, and we have no hesitation in saying that no actual fraud has been shown, indeed we do not understand counsel for appellee to seriously contend that actual fraud was in fact existent at the time the contracts were signed.

It is contended, however, with great zeal, and with considerable force, that constructive fraud should be inferred from the relationship of the parties, and the circumstances by which appellee was surrounded, regardless of any dishonesty of purpose. That his youth and inexperience made him an easy victim of a master mind in whom he placed special confidence and trust. It is not pointed out which of the parties is referred to as being the master mind that exercised an undue influence over the appellee and caused him, against his wishes, to execute the contracts in question, and this it may be assumed is because the record is silent on the subject.

From the hour of the death of decedent until the contract of December 3rd had been drawn and executed, no member of the family seems to have offered advice to the others, nor was there any attempt by persuasion, suggestion or otherwise, on the part of any person present, to induce the interested parties or either of them to sign the said contract. So far as the record discloses they were with one accord seeking to ascertain the will of the testator as expressed during his dying moments, and it was the thought of all present that the contract of December 3rd substantially embodied his wishes. That appellee entertained this view seems to admit of no doubt, for we find him as late as March 31, 1916, writing Allen G. Collins, attorney: "As I have stated, I know at the time of my uncle's death he wished his will changed  *  *  *  *  but I hope and trust we have arranged matters as near his wishes

as possible. Any way I for one, and I think my mother and sister, can feel that we have done our best to carry out what we think was his last wishes, but otherwise, I could never enjoy one cent unless I thought this."

After the lapse of more than four years he was apparently satisfied with the contract of December 15, 1915; had been regularly receiving the income on the $20,000.00 as provided therein, and had no thought of repudiating its terms or of denying its binding effect.

After he had arrived at the age of twenty-five years and under the contract was entitled to receive $10,-000.00, he made demand on the Virginia Trust Company for the amount due. The trust company in making settlement deducted inheritance tax and perhaps other items, making the amount he would receive appreciably less than $10,000.00. At this moment and for this cause the child of discontent was born; and it is not surprising that such was the result.

He thereafter made demand upon his sister looking to some adjustment of the difference between the $10,000.00 and the amount actually paid him. These negotiations failed, but up to that stage of the proceedings no discord had appeared. On this point the appellee has spoken in his testimony (record, page 130):

"Q. Was there any misunderstanding between you and your sister about any provisions of this contract before you signed this contract of December 15, 1915?

"A. No, sir; there was never any misunderstanding between my sister and me until it came up for me to get the money down here from the trust company; and when I went to Mr. Collins and found that he was not representing me, and got other lawyers to

look into the matter, and went into the whole thing. That was the first I found anything wrong with it; the first I knew anything about it at all.

"Q. Under the contract of December 15, 1915, you were to receive the sum of $10,000.00 when you became twenty-five years of age, were you not?

"A. Yes, sir.

"Q. Did you receive that sum?

"A. No, sir.

"Q. From the Virginia Trust Company, upon your arrival at the age of twenty-five?

"A  No, sir.

"Q. What did you receive?

"A. I received a little over $7,000.00.

"Q. In money?

"A. In bonds of the Virginia Railway and Power Company, and $500.00 cash that I had to pay over as taxes to the Virginia Trust Company when they were turned over to me.

"Q. You mean, the par value of the securities you received when you were twenty-five was a little over $7,000.00?

"A. Yes, sir.

"Q. Have you ever received any money from the estate of your uncle, other than the sum just mentioned by you?

"A. I received one check from my sister of $75.00 for interest paid out on the Hermitage Road place, or income from it, that I never used at all. That is the only benefit I have got from it at all.

"Q. Did you protest against the payment of only seven thousand and odd dollars to you?

"A. Yes, sir.

"Q. To whom did you make protest?

"A. I protested to the Virginia Trust Company. I

went to see Mr. Collins about it; I talked it over with my sister, my mother and brother-in-law.

"Q. Was anything done about it?

"A. No, sir; hasn't been anything done about it yet. Before this case came up my sister said that she would do what she could to get it for me."

Counsel for appellee have dealt with this case under the doctrine of constructive fraud, which they contend may be inferred from: (1) The intrinsic nature and subject of the bargain itself, and (2) that presumed from the circumstances and conditions of the immediate parties to the transaction. These divisions of the subject were in the main observed by Lord Hardwick in the noted case of *Chesterfield* v. *Jansson*, 2 Ves. Sr., 125, and this court will consider the questions raised under these two general divisions.

[9] (1) Constructive fraud may be inferred from the intrinsic nature and subject of the bargain itself.

[10] The contracts under consideration are not prohibited by the principles of the law, nor do their provisions offend against recognized rules of morality.

[11, 12] The nature of the contract is clearly one in which a family of a decedent believing his desires with reference to his property were not as expressed in his last will and testament, and being desirous that it should descend and pass as indicated by his last utterances on the subject—his written will to the contrary notwithstanding—agreed in family conference to give validity to his last unenforceable wish, and these contracts of December 3rd and 15th are the results of that family conference. It was clearly and unmistakably a family settlement.

Under the title family settlements, 14 Cyc. 132, it is said:

"Written agreement entered into between heirs for a

distribution of the property between them, left by
their ancestor, are given a liberal construction by the
courts." 1 Story's Equity Jur. sections 132, 137;
*Burnes* v. *Burnes* (C. C.), 132 Fed. 485; *Chandler* v.
*Pomeroy*, 143 U. S. 318, 12 S. Ct. 410, 36 L. Ed. 169;
*Hicks.* v. *Wynn*, 137 Va. 186, 119 S. E. 186.

Such contracts are not against public policy. On
the contrary, as they contribute to the peace and
harmony of families, and to the prevention of litigation,
they will be supported in equity without an enquiry
into the adequacy of the consideration on which they
are founded. *Leach* v. *Forbes*, 11 Gray (Mass.) 506,
71 Am. Dec. 732.

[13] Fraud is never presumed but must be established
by strong and clear, and convincing evidence. *Cyphers*
v. *Dingus*, 130 Va. 721, 108 S. E. 565.

[14] There is nothing in the intrinsic nature and
subject of the bargain itself from which constructive
fraud may be inferred unless the inadequacy of the
consideration received by appellee furnishes a sufficient
basis for that inference.

In Pomeroy's Eq. Jurisprudence, sections 927 and
928, we find this statement of the law:

"Although the actual cases in which a contract or
conveyance has been cancelled on account of gross
inadequacy merely, without other inequitable incidents,
are very few, yet the doctrine is settled, by a consensus
of decisions and *dicta*, that even in the absence of all
other circumstances, when the inadequacy of price is
so gross that it shocks the conscience, and furnishes a
satisfactory and decisive evidence of fraud, it will be a
sufficient ground for cancelling a conveyance or con-
tract, whether executed or executory. Even then
fraud, and not inadequacy of price, is the true and
only cause for the interposition of equity and the
granting of relief.

"If there is nothing but mere inadequacy of price, the case must be extreme, in order to call for the interposition of equity. Where the inadequacy does not stand alone, but is accompanied by other inequitable incidents, the relief is much more readily granted. * * * When the accompanying incidents are inequitable and show bad faith, such as concealments, misrepresentations, undue advantage, oppression on the part of one who obtains the benefit, or ignorance, weakness of mind, sickness, old age, incapacity, pecuniary necessities and the like, on the part of the other, these circumstances, combined with inadequacy of price, may easily induce a court to grant relief, defensive or affirmative."

Again in 6 Cyc. 286, the law is thus stated:

[15] "A contract or conveyance which is improvident, or based on an inadequate consideration, will not be set aside for these reasons alone, unless, as the rule is generally stated, the improvidence or inadequacy is so great as to furnish of itself convincing evidence of fraud."

In *Hale* v. *Wilkinson*, 21 Gratt (62 Va.) 75, 82, the court, in considering this subject, says:

"That it is not of itself a sufficient ground for setting aside a contract, unless the inadequacy be so great as to shock the moral sense, and thus be proof of actual fraud, seems to be well settled."

It may be well to enquire what was the consideration in this case, as respects James Atkins Gregory?

Under the terms of the will he was to receive $10,000.00 when he arrived at the age of twenty-five years, and one-third of the residue of the estate at his mother's death, subject to certain limitations and conditions. Under the agreement of December 15th he was to receive $20,000.00 under certain conditions, with no part of the residuum of the estate.

By this arrangement he has yielded his interest in the residue of the estate as given him by the will, a large sum of money, probably as much as $125,000.00, and these facts standing alone would create a situation where the benefits to be derived were so inconsequential as compared with the amount he would ultimately receive under the terms of the will, as to shock the moral sense, and thus become proof of fraud. *Hale* v. *Wilkinson*, 21 Gratt. (62 Va.) 75, 82.

In considering this phase of the case it should be borne in mind that appellee had no independent right to any part of his uncle's estate. His interest originated in the desire on the part of decedent that he should participate in the distribution, and was consummated in the will written June 15, 1904, expressing that desire with legal formalities. The execution of this will gave James Atkins Gregory no interest in the property therein bequeathed to him, so long as decedent lived. As long as he was alive the will could be revoked at pleasure, indeed, it may be said, there was no will until he died.

What was the situation on the morning of S. G. Atkins' death? Conscious of approaching dissolution, with a body broken by age, and burdened with frailties that wait on ripened years, his last earthly thought, the one that seemed to possess his mind and to disturb his otherwise peaceful journey to the far country, was this will of June 15, 1904. His final word to the devoted sister, the mother of appellee was: "To carry out his wish or he would not rest easy." He had attempted to make this wish known that morning both by writing and by word of mouth.

That S. G. Atkins did not wish his will as written in 1904 to stand was manifest to all of the parties in interest, including appellee, for we find him four months

later, writing from Blacksburg, Va. "As I have stated, I know at the time of my uncle's death he wished his will changed, and it is a great pity he could not have lived long enough to have done as he wished, but I hope and trust we have arranged matters as near his wishes as possible. Any way I for one, and I think my mother and sister, can feel that we have done our best to carry out what we think was his last wishes. And otherwise I could never enjoy one cent unless I thought this."

These were noble sentiments, expressed months after the contract of December 15th, and after months of reflection away from relatives and family connections under whose persuasive influences we are urged to believe he involuntarily signed the said agreements.

[16] Can it be said that a devisee or legatee under a will, who renounces its provisions in his behalf, acts without consideration, when convinced that in so doing he is observing the wish and will of the testator; when he is further convinced that the testator to whom he owed that respect and deference due to an uncle who had practically raised, supported and educated him, had unequivocally expressed a desire to revoke his will, and had gone as far as failing strength would permit in attempting to carry that purpose into effect, and had failed to do so only because sufficient time was not vouched him to finish the task?

Under such circumstances it would seem that for the appellee to have demanded a distribution of the property in accordance with the terms of the will of 1904 would have been equivalent to saying: " 'I know, at the time of my uncle's death he wished his will changed, and it is a great pity he could not have lived long enough to have done as he wished,' yet he failed to so express himself as to bind me, and I am

now going to demand what the will gave, regardless of his wishes."

Keeping in mind these circumstances and conditions, and the further fact that appellee, months after the family agreement had been executed, in his letter to attorney Collins, writes: "I for one, and I think my mother and sister, can feel that we have done our best to carry out what we think was his last wishes. And otherwise, I could never enjoy one cent unless I thought this," and the question of pecuniary consideration becomes an unimportant enquiry.

If the family contract and settlement needed any further or other consideration than is afforded by the mutual undertakings therein, we find it here expressed by appellee in the reasons assigned for executing the contract of December 15th. These views of James Atkins Gregory remained as here indicated until after he was twenty-five years of age, during which time most of the heirs had been settled with in accord with the terms of said contract.

We conclude, therefore, that the facts do not justify the court in "inferring fraud from the intrinsic nature and subject of the bargain itself."

[17] (2) The second division of the subject as heretofore adverted to is, *that fraud may be presumed from the circumstances and conditions of the immediate parties to the transaction.*

Pomeroy's Equity Jurisprudence (4th ed.), section 943, states the law to be as follows:

"This division embraces these cases in which a transaction, although it may be perfectly regular in its external form, and valid perhaps by the original rules of the common law, is impeachable in equity because it lacks that absolute consent which is regarded as an essential by courts of equity. The

equitable conception of true consent assumes a physical power of the party, an intellectual and moral power, and that he exercised these powers freely and deliberately. While the execution of an instrument in the regular legal manner will undoubtedly, in the absence of all contrary evidence, raise a *prima facie* presumption that the consent was present, the real consent may be prevented or destroyed by surrounding physical circumstances, by the want of intellectual or moral capacity in the party himself, or by physical, intellectual or moral force controlling the free operation of his own will. This phase of so-called constructive fraud necessarily involves a great variety of instances and several degrees of invalidity. It includes transactions absolutely void from complete incapacity, others which are voidable, and others which are only presumptively invalid, and which throw the burden of proof upon the parties claiming their benefit to overcome this presumption."

Counsel for appellee treats this subject under the following classifications:

First. The intimate and confidential relations existing between Atkins Gregory and the other parties to the contracts.

They were all either relatives of the decedent or connections of the relatives by marriage. In the latter class were Dr. Pfeiffer and A. J. Moore. In almost every family settlement a like condition exists and we think, therefore, that this fact standing alone would not be fatal to any arrangement that might be agreed to. Atkins Gregory was the youngest member of the family, and might be amenable to suggestions or easily influenced by his mother, his sister or perhaps others of the family there present, and if in his signing the contracts of December 3rd

and 15th, there was lacking that absolute consent which is regarded as an essential by courts of equity; that want of opportunity for a full and independent operation of his own will, then surely he should not be held responsible because of his having signed the said contracts.

What are the facts surrounding the execution of the contract of December 3rd?

The family were assembled in one of the rooms of decedent's home; all of the persons present with Mr. Atkins on the morning of his death came before the family and stated their several recollections of his statements as to how he wished his estate distributed. The unfinished and unsigned paper by which he attempted to write a new will was also before them. At this time Dr. Pfeiffer made memorandums of the substance of the statements of those who gave their testimony as they severally came into the room.

On December 3rd Capt. Coke, decedent's counsel, and Mr. Herbert Jackson came to the home and met all of the members of the family, bringing with him the will of 1904. In their presence he read and explained it, and made it clear to all present that nothing done by decedent on the morning of his demise would in any way affect the validity of the will.

He was there informed of the attempt on the part of Mr. Atkins to revoke his will on the morning of his death, and of the statements made by those at the bedside, and was asked if these wishes could be made effective, all of the heirs consenting, and if he would draw the necessary agreement. It does not appear who made this suggestion but, it does appear that Mrs. Moore, the appellant, was adverse to taking this action at this time. Capt Coke, Mr. Jackson and Dr. Pfeiffer repaired to another room and the contract

of December 3rd was drawn up, brought back and read to all of the family and by them signed.

If any member of the family or any other person urged, requested or suggested that Atkins Gregory should sign the contract the record fails to so indicate.

"Q. Well, did you talk it over or advise with any one as to whether or not you should sign the paper?

"A. I was not advised by any one, and did not go to any one for any advice about it at all."

This agreement of December 3rd was a mere memorandum or skeleton, and necessitated the drawing of a more formal indenture, which was done later and is referred to as the agreement of December 15th, and while bearing that date was not signed by appellee until March 25, 1916.

Allen G. Collins of the Richmond bar assisted Capt. Coke in the drawing of this paper, and while some doubt seems to exist in the mind of Mr. Collins as to whether he represented appellee along with his mother and sister, it does appear from the record that Atkins Gregory was several times in his office during the preparation of the contract, read it himself, and had its terms explained by Mr. Collins, who impressed upon him the fact that the will was valid and must stand, and that in signing the agreement: "As I stated to you, you are giving up a large interest in the estate, but it seems to be your wish."

The first paragraph in the contract, which Atkins Gregory says he read in Collins' office, is as follows:

"First: That said several parties recognize, accept and agree that the said will of June 15, 1904, is under the statute laws of this State the last will and testament of the said Samuel G. Atkins, deceased, and that his said estate must be administered under the provisions of said will and not otherwise."

So it would seem that both Capt. Coke, representing no interest save as general attorney for the decedent, and Allen G. Collins, who was apparently representing Mrs. Gregory and her two children, had both advised appellee of his rights and Collins had told him more than once what it meant for him to sign the contract. He was also told and retold that the will of 1904 was absolutely binding on all parties. Moreover, he knew that both Dr. Tompkins and Mr. Watkins over their signed statement had said the dying wish of Mr. Atkins was that his old will be ignored. This statement was copied in *extenso* in the second clause of the same contract.

For about four years prior to bringing this suit he had been in possession of all the facts surrounding the execution of the contracts in question. Certain it is that the most casual enquiry during these years would have given him all the information he now possesses.

Dr. Pfeiffer, Mrs. Helen Gray Moore, Mrs. O. M. Atkins, wife of Dr. H. L. Atkins, deceased, and Mrs. P. B. Wilkes, a niece, all testified that appellant was to have the residue of the estate. An excerpt from the testimony of the last named witness is typical of their statements:

"Q. Now, will you please state your recollection of what occurred then?

"A. Why, of course, my uncle having died, we were trying to carry out my uncle's dying wishes. He said that a will that he had written he wanted to be null and void. Therefore, the whole family had gotten together for these servants and the gentlemen, Dr. Tompkins and Mr. Watkins, to state what he had said. We were together for that reason, to get these statements down so something could be done to carry out his wishes. He said he did not want his will recognized, and had

made the appeal that Mrs. Gregory, for she was the largest beneficiary in it then, should ignore his former will and carry out his dying wishes as a will. We were trying to get together to get those formulated for that purpose.

"Q. Were statements made by the servants?

"A. The three servants testified that he wanted his nieces to have $20,000.00 each, and Mr. Atkins Gregory to have $20,000.00, and Mrs. Moore to have $100,000.00 and the store and the business, and the rest to Miss Helen. Do you want me to go into the details of the statement?

"Q. Yes.

"A. The three negroes testified to that, that he said $20,000.00. The gentlemen came later, Mr. Watkins first and then Dr. Tompkins last. Mr. Watkins said that having gotten there soon after one servant had started for him the second time, Mr. Atkins weaker, and he, Mr. Watkins, being deaf, made it hard to hear him, and the servants getting there first got it more perfect what he wanted. The family agreed that the nieces should have $20,000.00, on account of thinking that the servants' testimony was the nearest to being right. Mr. Watkins—I have a faint recollection of hearing this: I had never heard a word about the residue before, and he turned to Dr. Pfeiffer and used the word, 'residue.' Now, of course, it has been between six and seven years since this contract has been running, and naturally the details would be vague, but that was the first time I ever heard the word 'residue' brought in, and I am confident that Mr. Watkins said: 'The residue you would call it, the balance, to Miss Helen.' That was the first time I heard the word residue."

Mr. Preston B. Wilkes testifies that at the family

conference of December 2nd Mr. Watkins made a specific statement with respect to the decedent's wishes concerning the residue.

"Q. When Mr. Watkins made his statement on December 2nd, did he make any statement in connection with the residue?

"A. Yes, sir.

"Q. Can you state your recollection of it?

"A. After making that statement, he turned to Dr. Pfeiffer and said: 'And Miss Helen to get the balance, I believe you call it the residue.' And he also turned to Mrs. Gregory and he pointed his finger at her and told her that Mr. Atkins said that if she did not carry out his dying wishes he would not rest in his grave."

On this subject Atkins Gregory himself says: "I was trying my best to carry out his wishes, what he wanted done with his estate. That was the intention of everybody then. When the question came up about the residue, I took the say-so of everybody else; that was what everybody had to do, and it seemed that Mr. Watkins made this statement, and he was a responsible man, and I didn't look into it any further.

If this evidence establishes any fact it is that Mr. Atkins desired appellant to have the residue of the estate. The record discloses no ground for assuming that these witnesses, with the exception of Mrs. Helen Gray Moore, had the remotest interest in the disposition of the residue of the estate, and no reason is apparent why they should have wanted to see the residue go to the sister rather than to the brother, but on the contrary, every reason why they would naturally have preferred to see the same divided between them.

The shares of each of the other nieces and nephews had been definitely ascertained and agreed upon. They were neither benefited nor injured, however this question was determined.

The one outstanding fact running through the entire
record is, that at these two meetings of December 2nd
and 3rd the members of the Atkins family were honestly
striving to ascertain, as best they could, just what the
decedent had indicated as his wish and will on the morn-
ing of his death, and how best to give effect to his
desires.

There is no attempt to influence any of the parties.
There is no advice, persuasion or blandishment em-
ployed.   There are no secret meetings, but on the con-
trary, every move was in the open; every conference a
committee of the whole; every fact in connection with
the transactions under criticism, known alike to each
and all.

It seems to us there can be no reasonable doubt but
that the contracts of December 3rd and 15th embody
substantially the will of Samuel G. Atkins as expressed
during his dying hour.   This seems to have been an
accepted fact at that time, so treated and acted upon
then and for nearly four years thereafter.

It is insisted by counsel for appellee that the contracts
should not be sustained because Atkins Gregory had
no counsel to advise him, or with whom he might con-
sult during these negotiations.   That Mr. Allen G.
Collins to whose office he went on more than one oc-
casion between the death of his uncle and the time that
he executed the contract of December 15th was not
representing him, though he thought at that time he
was.   That he had thus been deprived of independent
counsel and had acted without being properly informed
of his rights or advised as to how they might be pro-
tected.

We are referred to numerous authorities on this
general subject.   The legal principle may be gleaned
from just a few brief quotations.

In *Neal* v. *Black*, 177 Pa. 85, 97, 35 A. 561, 34 L. R. A. 707, it is said:

"But it is claimed that Neal did not have proper counsel and advice and that the deed should be revoked, if for no other reason, because Neal acted 'without any independent advice.' Some of the cases say that of itself is sufficient ground for setting aside a voluntary deed. What is independent advice? We think an examination of the cases will show that the word is used as a synonym of 'impartial.' One of the definitions of the word is 'not subject to bias or influence.' "

In *Zimmerman* v. *Frushour*, 108 Md. 115, 16 L. R. A. (N. S.) 1087, 69 A. 796, 15 Ann. Cas. 1128, it is said:

"That the question whether or not such advice was given is a material one, to be considered with other surrounding facts and circumstances, such as the nature and purpose of the gift and the condition and relation of the parties, is readily conceded by all the courts. * * * The failure of the donor to secure independent advice may tend strongly to show undue influence, especially if such failure was due to persuasion or conduct of the donee."

In *Statham* v. *Ferguson's Admr.*, 26 Gratt. (66 Va.) 28, the court in speaking of the widow whose deed, at her instance, was set aside, says:

"She had neither time nor opportunity, if she had been disposed, to consult with counsel or disinterested friends on the subject * * * *. There was not in the large assemblage then present one human being, besides herself, who was not interested against her in the execution of the deed."

[18, 19] The principle of the law which insures to those whose property interests are the subject of litigation, or of disposition *in pais*, the right to independent or impartial advice has for its purpose the enabling of

·such an one to know his rights, and to act in respect
thereto, with a knowledge of the consequences which
may be reasonably expected to follow such action.   Did
Atkins Gregory receive such advice and was he properly
informed of the consequences of his acts?

On the morning of December 3rd Capt. Coke, the
attorney for decedent, read and explained to all the
relatives the binding and legal effect of the will.   The
contract of December 15th in the first clause thereof
declares it to be the last will and testament and "that
his said estate must be administered under the pro-
visions of said will and not otherwise."   This is lan-
guage too plain to be misunderstood.

It is not difficult to understand how Mr. Allen G.
·Collins could have been uncertain as to his exact status
as attorney, with respect to Atkins Gregory.   At this
time there was no conflict of interest between the
mother, sister and brother.   They were apparently all
·working to one end, namely, to put into legal form a
paper that would carry out the wishes of decedent, and
avoid the legal effect of a will he had declared his de-
·sire to annul.   Atkins Gregory in his evidence makes
this plain:

"Q. Was there any misunderstanding between you
and your sister, about any provisions of this contract,
before you signed this contract of December 15, 1915.

"A. No, sir; there was never any misunderstanding
between my sister and me until it came up for me to
get the money down here from the trust company"
(in 1919).

It seems therefore but just to say, in passing, that the
court sees nothing worthy of criticism in the part played
by Mr. Collins in the transactions leading up to this
litigation.

Whether the attorney of Atkins Gregory or not, he

has done everything that could have been expected of one occupying that relation. His testimony which stands uncontradicted is here reproduced in part:

"Mr. James Atkins Gregory saw me several times, I can't say just how many, between December 15, 1915, and the date on which he signed the agreement of December 15, 1915, he having signed it, as the record shows, sometime, I think, in March. In discussing the matter with Mr. Gregory and Mrs. Gregory when they called at my office, I had the original agreement as prepared by Capt. Coke before me, but I had not made the changes which I afterwards suggested, and I told them that I knew of no ground upon which the will of S. G. Atkins, dated in 1904, could be attacked, and that therefore the estate would have to be divided or distributed according to that will, but that the parties could have an agreement to carry out his wishes if they agreed thereto. As stated, whenever Mr. James Atkins Gregory was at my office, I talked with him about the proposed agreement and the estate, and explained to him fully the situation as I understood it; and when he signed the agreement, as he did sign it, I read it over to him and went over each paragraph with him; and I then cautioned him that he was extremely liberal in giving up a large interest in the estate to carry out what were considered the wishes of Mr. Atkins."

The same advice is given him on March 25, 1916, in the letter mailed to him at Blacksburg, heretofore adverted to in this opinion.

Every advantage that impartial legal advice could have afforded has been his. He was not only fully informed, but persistently warned of the effect of this contract, and in the face of it all chose his course. There is one explanation of his doings in this matter, that we think is in keeping with the uncontradicted

·evidence in the case, and it is to his credit as well, name-
ly, that he was carrying out the manifest wish of his
uncle. We are of the opinion, therefore, there is no
merit in the contention that he should be absolved from
his obligation because he did not have an opportunity
of securing impartial advice.

When considered from the standpoint of the amount
appellee would have received under the will as compared
with the provision made for him in the contract of
December 15th, the disparity is shockingly great, but
it must not be forgotten, as previously adverted to, that
testator had the absolute right to dispose of his estate
according to his own will, and if it was his will that
appellee should only receive $20,000.00 under the con-
ditions as set out in the contract, then he has yielded
nothing, but is receiving all, that in equity and good
conscience he should receive.

While it is said in 9 Corpus Juris, page 1175, that
"equity does not undertake to act as guardian of
.mankind, it does not aid people who make foolish
bargains," we do not think this case involves the ap-
plication of the principle above referred to, nor are we
willing to say that a party who signs a contract to make
·effective the expressed purpose of his benefactor, left
incomplete because the approach of death palsied the
indicting hand, needs a guardian or can be charged
with making a foolish bargain.

Atkins Gregory at that time seems to have done what
he and all the others thought to be in furtherance of the
decedent's wish. Their contract was regular on its
face, plain in its terms, and easily understandable.
They were all capable of contracting with respect to their
property rights, and in so far as this record discloses
·did so without suggestion, persuasion or constraint.
Under such circumstances courts of equity are power-
less to annul obligations thus assumed.

While it may be doubtful if the pleadings present a case in which the court is justified in granting any relief to appellee as respects the manner in which he was settled with under the terms of the contract of December 15, 1915, we are unable to find any authority therein for reducing the amount to which he was entitled, and are of the opinion the $10,000.00 should be paid to him in full, and not having been so paid he should receive interest on the unpaid balance from the time the settlement was made to the time of payment. It would seem to us that appellant should not want to do less than this, and should she do more we believe she would have many occasions for self-congratulation, and be commended by those familiar with the facts leading up to this unfortunate litigation.

                                    *Reversed and remanded.*

CHRISTIAN, J., dissenting:

On June 15, 1904, Samuel G. Atkins, a wealthy bachelor, made his will, whereby he made special bequests to various relatives and gave the residue of his estate to his sister for life, with remainder to her children, two-thirds to Helen Gray Moore and one-third to James Atkins Gregory.

While in *extremis* on November 30, 1915, he undertook to revoke this will, but being too weak, it is said that he told his three negro servants that he wanted to revoke his will and what disposition he wanted made of his estate, and subsequently sent for C. T. Watkins and his physician, Dr. Tompkins, to whom he also stated his wishes.

After the funeral his relatives, without knowledge of the contents of his will, assembled at his residence and

agreed among themselves to revoke his will and carry into effect his wishes as detailed by the three ignorant negroes, supplemented by the evidence of Mr. Watkins and Dr. Tompkins, where it was most beneficial to every one except Atkins Gregory and his mother. This agreement was absolutely void because in violation of section 5233 Virginia Code and the public policy of every civilized country.

Next day Captain Coke, attorney for Mr. Atkins, and Mr. Jackson of the Virginia Trust Company, which company was made one of his executors, came to the residence and read the will. Captain Coke told them that the will would have to be probated, and the estate held under the terms of the will, but that the parties could make a collateral agreement carrying out the terms of their previous agreement which he and Mr. Collins undertook to put in binding form. By this agreement every relative profited largely except Mrs. Gregory and Atkins Gregory, who surrendered not less than $125,000.00 to $150,000.00. Atkins Gregory was an inexperienced college student who had attained his majority in the previous July. This suit was brought to set aside this agreement and establish the will.

It is manifest that there is no consideration to sustain this agreement except the wishes of Mr. Atkins, which contravene the statute law and sound public policy, and if the courts were to compel specific performance of such contracts would open a Pandora's box of fraud upon them. Freedom of contract is not superior to the sanctity of wills and other written instruments.

It is the contention of the appellant that this was a "family settlement." In the cases cited to sustain this contention of *Lucketts* v. *Lucketts*, 10 Leigh (37 Va.)

50, and *Statham* v. *Ferguson's Admr.*, 25 Gratt. (66 Va.) 28, the wills were perfectly valid, but failed of probate for defective witnessing. Thus the parties were relegated to their rights by descent and the wills answered every requirement of law except as to technical form of execution. There being no doubt about the will of the testator (only the fact that the subscribing witnesses were not present at the same time, prevented its probate), the courts look with favor on the heirs and distributees by contract giving effect to such will. In the instant case none of the relatives had any rights to compromise or surrender except Mrs. Gregory and Atkins. Their pretense of claim was based on the hearsay testimony of five persons that an old man *in extremis* desired his will (which had been in existence and unchanged for eleven years) revoked by parol, and that he would not rest in his grave unless his sister, Mrs. Gregory, who was only life tenant as to the residue of his estate, carried out his wishes as to the disposition of the same. It is plain that this was no family settlement which the courts favor, but an effort to revoke a will by parol, and distribute a large estate according to the recollection of three ignorant servants, corroborated in the main by the recollection of Mr. Watkins, and the memoranda of Dr. Tompkins. The contract does indirectly what the law forbids, and the initial question is, should not sound public policy forbid its enforcement, or at least cast upon the beneficiaries the burden of showing its fairness and justice.

The learned chancellor of the trial court based his opinion in rescinding this contract upon the second form or class of fraud in equity, as laid down by Lord Hardwicke in the leading and celebrated case of *Chesterfield* v. *Janssen*, 2 Ves. Sen. 125, 1 Eq. Lead.

Cas. (4th Am. Ed.) 773, as follows: "Secondly, it (fraud) may be apparent from the intrinsic nature and subject of the bargain itself, such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other, which are unequitable and unconscientious bargains." Counsel for appellant claim the doctrine and classification of fraud as laid down in *Chesterfield* v. *Janssen, supra,* have never been the law in Virginia and cite as authority for that contention *Cribbens* v. *Markwood*, 13 Gratt. (54 Va.) 495, 67 Am. Dec. 775. The public policy of England forbade the sale of expectancies and the case of *Cribbens* v. *Markwood* decided that the English doctrine in relation to the sale of expectant interests, so far as it relates to vested interests, not to be law in this State. The classes and division of fraud based upon *their intrinsic qualities*, as enunciated by Lord Hardwicke in the case of *Chesterfield* v. *Janssen*, instead of being annulled by statute has been followed by nearly all subsequent writers and judges. Pomeroy's Equity Jurisprudence, 874.

Under the classification of "constructive fraud apparent from the intrinsic nature and subject of the transaction itself," the principal evidence of fraud is "inadequacy of consideration." This relates to contracts where there is a subject matter transferred or dealt with and price paid or to be paid. Conceding, as claimed by the appellant, that the contract in the instant case is the transfer of a subject for a price paid. In some of the earlier decisions mere inadequacy either in price or value of the subject was held sufficient hardship for relief in equity. *Seymour* v. *Delaney*, 6 Johns. Chan. 222, 224, 225. "The doctrine, however, is now settled that mere inadequacy—that is, inequality in

value between the subject matter and the price—is not a ground for refusing the remedy of specific performance. In order to be a defense the inadequacy must either be accompanied by other inequitable incidents, *or must be so gross as to show fraud.*" Pomeroy's Equity Jurisprudence, 926.

The above is the law in Virginia as reviewed in *Hale* v. *Wilkinson*, 21 Gratt. (62 Va.) 75-82. But Lord Eldon, who was one of the first chancellors to introduce the rule in regard to *mere inadequacy* of price into the law, held in *Coles* v. *Trecothich*, 9 Ves. 246, that gross inadequacy of price was conclusive evidence of fraud. He said, on page 246: "Unless the inadequacy of price is such as shocks the conscience and amounts in itself to conclusive and decisive evidence of fraud in the transaction, it is not itself a sufficient ground for refusing a specific performance." In Virginia gross inadequacy of price is sufficient ground for relief in equity. *Bresee* v. *Bradfield*, 99 Va. 331; *Mayo* v. *Carrington*, 19 Gratt. (60 Va.) 74-107.

Lord Thurlow, in *Gwynne* v. *Heaton*, 1 Bro. Ch. 1, 9, describes gross inadequacy as follows: "An inequality so strong, gross and manifest, that it must be impossible to state it to a man of common sense without producing exclamation at the inequality."

Whether the contract was such that it was unequitable and unconscientious, such as the parties should not have accepted, does not depend on any particular *indicia* of fraud, but the chancellor may consider the relations of the parties, the age and inexperience of the complainant, the obligations and ties of blood and affection of the beneficiaries, their influence over him, and the result of the transaction, and if the chancellor feels satisfied from all the circumstances that the agreement was unconscionable, he should grant relief.

No case can be found in the annals of equity jurisprudence where a sister and daughter has stripped her mother and young brother of a magnificent estate, and given them a dole, where the court has sustained it. No principle of justice or special pleading can warrant the upholding of this contract.

Chinn, J., dissenting:

Upon the broad principles of equity and justice, I do not think this contract should be allowed to stand.

It is a settled doctrine of equity that "wherever two persons stand in such relation that, while it continues, confidence is necessarily reposed by one and the influence which naturally grows out of that confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, *although the transaction could not have been impeached if no such confidential relation had existed * * * * *.* It is settled by an overwhelming weight of authority, that the principle extends to every possible case in which a fiduciary relation exists *as a fact,* in which there is confidence reposed on one side and the resulting superiority and influence on the other. The relation and duties involved in it need not be legal; it may be moral, social, domestic or merely personal." *Branch* v. *Buckley,* 109 Va. 784, 65 S. E. 652; Pomeroy on Equity Jurisprudence, section 956. And the existence of this fiduciary relation or state of confidence, of whatever character that confidence may be, imposes upon the person occupying the position of confidence and trust the duty to make the fullest and fairest explanation and communication of every particular resting in his breast, or to give full

opportunity to the person trusting him and occupying the inferior position to make a thorough investigation in regard to the transaction, otherwise it should not be allowed to stand.

In the case here, it may be said that all the parties to the transaction in question—cetainly Mrs. Gregory, Mr. and Mrs. Moore, and Dr. Pfeiffer—occupied a position of superiority and influence over the complainant, on account of the confidence he naturally reposed in them by reason of ties of relationship, age, and superior intelligence and experience. He had barely reached his majority, was merely a college student, and had no business or legal training or experience. Up to that time he had been dependent upon his deceased uncle for his education, maintenance and support. On the day of the funeral, when the agreement was made among the parties for the distribution of Mr. Atkins' estate, he knew nothing of what his interests under the will would be, or the legal effect of what had occurred in Mr. Atkins' dying moments. He had suddenly and unexpectedly been summoned from school to attend his uncle's funeral, and when called on to meet the others in family conclave was confronted with the apparently solemn procedure of hearing the statements of Dr. Tompkins, Mr. Watkins and the three negro servants as to the scene around his uncle's death bed. After this ceremony he was told by his elders and superiors that his uncle desired to cut him off from a share in his estate, although none of the death bed witnesses could or had testified that Mr. Atkins had mentioned his name, or had completed his directions as to how his large estate was to be distributed among those for whom he had always shown affection and who had been dependent upon him. It is almost beyond the credulity of anyone who knows aught of human nature and the

natural sentiments of the human heart, to believe that this uncle intended to leave a nephew—who had occupied his house as a member of his family for many years, whom he was even at the time of his death supporting and educating, and to whom he had left a fortune by the terms of a valid and existing will executed eleven years before—only a miserable pittance of his large estate, and turn him adrift on his own resources after so many years of nurture and fatherly care. He was not consulted as to what should be done, nor did anyone present seem to care what he thought or how he felt. He was to all intents and purposes merely a passive and plastic figure of clay in the hands of those in whom he reposed, and had the right to repose, implicit confidence and trust, and who, in consequence of this confidence and trust exercised an influence over him which could not fail to be of the most complete and potential character. He merely did what they told him he ought to do to carry out his uncle's wishes. Under these circumstances it was the duty of those who occupied this fiduciary relation to this young man not only to advise him, but to see to it that he took full time to investigate the important matter before him and to obtain independent advice in order that he might know what it was proposed he should give away, and what his legal rights were in the premises. It does not alter the constructive fraud or breach of confidence attending this transaction that he did not sign the contract until the next day, or the formal contract until several months afterwards. The influence exercised over him had had its effect, and the transaction had been accomplished. When they obtained his passive consent to the agreement the day of the funeral, the same influence which existed then continued to exist until he found that even the small

amount which had been allotted him by the rest of the family was to be curtailed.   Nor does the delay in bringing this suit affect the bad faith of the original transaction, for the estate being held in trust is still intact and the rights of no one can be prejudiced by it. If a court of equity should, as it can do, give the relief prayed for, the transaction should be avoided *ab initio*, and I am in favor of so doing.   The vice of the transaction lies in the meeting held the day of the funeral.

I realize the importance of upholding the sanctity of contracts, but only those which represent the free will of the parties, untainted by fraud, either actual or constructive, or an influence which overpowers the will, should receive the favorable consideration of a court of equity and good conscience.