## Richmond.

HARRY D. WEADE AND OTHERS v. ANNIE F. WEADE AND OTHERS.

November 14, 1929.

The opinion states the case.

*G. H. Branaman*, for the appellants.

*Chas. J. Churchman* and *W. H. Landes*, for the appellees.

CAMPBELL, J., delivered the opinion of the court.

This appeal from a decree of the Circuit Court of Augusta county involves a controversy between the heirs at law of James W. Weade, who died on the 6th day of December, 1922, after having made and published his last will and testament, which was dated January 30, 1920.

Testator's wife had predeceased him, but after the execution of his will. He left surviving him ten children, all adults. By the provisions of his will, testator, after providing for a life estate for his wife, devised and bequeathed his property, real and personal, as follows: To his daughters, Edith M. Weade and Annie F. Weade, the sum of $500.00 each, all of his household and kitchen furniture and an automobile, and then directed that the residue thereof be sold by his executor two years after his death, and the proceeds derived from the sale thereof divided among all of his children, after deducting certain advancements made during his lifetime.

Eight of the children, four sons and four daughters, had married several years prior to the death of their father, and had removed from the vicinity of the an-

cestral home. Annie and Edith Weade lived at the home with their parents and for a number of years devoted to their mother, who was a paralytic, their constant attention. In further recognition of their unfailing love and attention to their mother and to him, as denoted by an unsigned and undated codicil to his will, testator directed his executor to pay to each of his two unmarried daughters the additional sum of $500.00, and also directed that the farm and personal property be kept intact in order to provide a home for Annie and Edith.

After the burial of J. W. Weade, on December 8, 1922, all of the children except, Carrie W. Blake, who was represented by her husband, gathered at the home place. The will was read at this conference, also the unsigned codicil. Frank Weade, the eldest of the children, who was the executor under the will, stated to the children there gathered that he was of opinion that the daughters, Edith and Annie, should have compensation in addition to that provided for them in the will for the services rendered to their father and mother. By way of added emphasis, he also stated that the two daughters had a valid claim in law against the estate for services rendered. While it is true that neither Annie nor Edith personally asserted any claim against the estate, it is apparent from the record that the heirs present were impressed with the statement of Frank Weade that they could file a claim against the estate. It is also true that neither Annie nor Edith mentioned any contract between them and their father in regard to the services rendered. As a matter of fact, no contract had ever been entered into, but it is apparent from the record that Frank Weade was their spokesman and they acquiesced in his statement. The record also clearly shows that appellants were impressed with

the idea that litigation was impending unless a compromise was effected, and to avoid such a contingency the following instrument was drawn up and signed:

"It is hereby understood and agreed by and between those whose signatures are affixed to this agreement that in the settlement of the estate of the late James W. Weade, of Waynesboro, county of Augusta, Commonwealth of Virginia, that in addition to the bequest in his last will and testament of $500.00 each to his daughters Edith M. Weade and Annie F. Weade and the additional bequest, in the codicil to the above mentioned will and testament, of an equal amount ($500.00) to each of the aforesaid daughters Edith M. Weade and Annie F. Weade, that they shall be paid the sum of one thousand five hundred dollars each in recognition of their faithful and unremitting care given their parents in their last illness, lasting in the case of both father and mother for over a period of ten years, and for their services in caring for the tangible interests of the estate both real and personal.

"It is therefore understood that this sum of two thousand five hundred dollars shall be paid to each of aforesaid daughters Edith M. Weade and Annie F. Weade out of the proceeds of the estate after the lawful debts of the late James W. Meade be settled, and that the rest and residue of the estate be divided as per directions contained in his last will and testament.

"In witness whereof we have hereunto affixed our signatures this eighth day of December, one thousand nine hundred and twenty-two.

"Witness my hand and seal.

| | |
|---|---|
| "Frank Weade | "Harry D. Weade |
| "Lena M. Coyner | "Louise F. Ballard |
| "F. M. Weade | "Carrie W. Blake |
| "Mary A. Harner | by Ronald Blake." |

The executor having failed to make settlement of the estate for a period of four years, appellants filed their bill asking for a sale of the property, settlement of the executorial accounts, and seeking to hold the executor liable for the rents and profits. Pursuant to the prayer of the bill the land was decreed to be sold, and upon the coming in of the report of sale the court entered a decree referring to a master commissioner the questions of the validity of the alleged contract and the liability of the executor for rents and profits. This report was confirmed by decree of the court and from that decree this appeal was allowed.

From the date of the signing of the contract until the institution of suit, appellants, H. D. Weade, J. M. Weade, Fred M. Weade, Mary A. Harner and Lou J. Ballard acquiesced in the disposition of the estate of their father as set forth in the paper of December 8, 1922. No question was raised as to the validity of the contract until the filing of the report of Commissioner Nelson. Then, for the first time, it was attacked on the ground that the services rendered by Annie and Edith Weade to their father and mother were rendered voluntarily and without express contract, verbal, or in writing, and that the alleged contract was not based upon a valuable consideration and, therefore, they have the legal right to repudiate same.

It is a well settled rule of law that in the absence of an express contract a child cannot recover for services rendered a parent, the presumption being that such services were performed in recognition of a filial duty. It is also true that in order to give to an executory contract binding legal effect it must be based upon a valid consideration.

Strictly speaking, there are many contracts

unenforceable in a court of law, for the reason that
they lack a legal consideration, but when tested by
equitable rules they are enforceable for the reason that
equity looks to the substance and enforces with a strong
hand such contracts because the repose of family re-
lationships demands it. Such a contract is the one we
are here dealing with. It is, in our view, clearly a
result of what the courts denominate a "family settle-
ment." Testator in his will, executed prior to the
death of his wife, had made certain bequests to his two
unmarried daughters. Because of their unfailing care
of and attention to his wife and himself, lasting over a
period of ten years, testator, as he expressed it, "wish-
ing to make an addition or codicil to my former will,"
prepared a paper bequeathing to both Annie and Edith
Weade an additional sum of $500.00. He also directed
that the real and personal property should remain
unsold for the term of two years in order to provide a
home for the daughters. This paper was ineffective, as
J. W. Weade failed to sign it. It also appears from a
statement in the contract that the daughters had been
diligent in preserving both the real and personal
property for the benefit of the estate.

The family had all this information before them.
They were all of the opinion that the statement of
Frank Weade that the daughters held a valid claim
against the estate was well founded. The appellants
were anxious, as they testified, to avoid litigation
involving the family and to recompense their sisters
for services rendered. They were dealing at arm's
length, all having the right to accept or reject the pro-
posal of Frank Weade, all being *sui juris*, and yet,
without any suggestion of fraud, they signed the agree-
ment which they now seek to repudiate. This they
will not be permitted to do.

A court of equity looks with favor upon family settlements and is not meticulous in seeking to discover legal complications.

In 5 R. C. L. 877, section 2, it is said: "It may be said of compromises generally that 'the compromise of any matter is valid and binding, not because it is the settlement of a valid claim, but because it is the settlement of a controversy."

In *Trigg* v. *Read*, 5 Humph. (Tenn.) 529, 42 Am. Dec. 447, we read: " 'In the cases of family compromises, all that need be said here is that agreements affecting them are upheld with a strong hand, and an equity has been administered in regard to them, which has not been applied to agreements generally, upon the ground that the honor and peace of families make it just and proper so to do.' "

In *Price* v. *Winston*, 4 Munf. (18 Va.) 63, in the syllabus, it is said: "A testator having devised certain slaves to his sister, 'during her life, and, after decease, to the children which she shall leave at her death, to be equally divided among them, to them and their heirs forever'; a written agreement not under seal, entered into, in her lifetime, by all her children then living, 'to stand to a fair and equal division of said estate among the children who shall be living at her death, and the issue of such as have or may die before her,' is not a *nudum pactum*, but founded on sufficient consideration, and therefore binding on the contracting parties."

In *Moore* v. *Gregory*, 146 Va. 504, 131 S. E. 692, 697, it appears that the decedent, S. G. Adkins, had made a valid will but at the point of death he decided to change his will and attempted to do so but was too weak. He then before a number of witnesses stated how he

wished to have his property distributed, and his wish that the will be ignored. Shortly afterwards the heirs met and agreed to a division of the property in accordance with testator's wishes, and signed the agreement. This agreement was entered into by all the heirs without coercion or suggestion. The appellee was the youngest of the heirs and it was explained to him before he signed that the will was valid; and that, under the agreement, he would take much less than under the will. In holding the agreement was valid and binding, Judge McLemore had this to say: "Generally speaking, every adult person has a right to contract with respect to his property rights and when they have done so, courts are without authority to annul their obligations thus assumed unless they have been entered into under such circumstances as to indicate that their procurement had been brought about by fraud."

In 12 Corpus Juris, page 322, the doctrine is stated thus: "Compromises having for their object the settlement of family difficulties or controversies are favored at law and in equity if at all reasonable. The termination of such controversies is considered a valid and sufficient consideration for the agreement, and the court will go further to sustain it than it would under ordinary circumstances. Accordingly, it has been laid down as a general rule that a family agreement entered into on the supposition of a right, or of a doubtful right, although it afterwards turns out that the right was on the other side, is binding, and the right cannot prevail against the agreement of the parties."

We are not unmindful of the fact that many respectable authorities hold that the surrender of a claim which is entirely without foundation in law does

not afford a consideration for a compromise of family disputes. See C. J., page 327.

While the record does show that Annie and Edith Weade testified that they primarily rendered the service to their parents without expectation of reward, it also shows that three of the appellants were not merely actuated by the motive expressed in the contract that the sisters should be compensated for the "faithful and unremitting love" bestowed upon the parents. In signing the agreement those appellants were also actuated by the all-impelling motive of self gain. Harry Weade, in response to the question; "What prompted you then to sign it?," made this answer: "Well, I thought it would be better to give them that much than for them to bring in a bill and bring it into court and get it all."

John Weade testified in part as follows:

"Q. Is it not a fact that you were present in the family conference when it was agreed to make a contract in writing to be signed by the heirs whereby your two sisters were to have the extra legacies provided for by your father in the unsigned codicil to his will, and, that you did sign the said contract, and do you not still feel bound by said contract?

"A. I was present at the conference but there was no agreement about any extra legacies to my knowledge. There was an agreement signed at this conference to pay Edith and Annie $1,500.00 each, but I don't feel bound by this agreement because of the misrepresentations that were made to get us to sign and the way they have done since."

Fred Weade's statement in regard to his signing the agreement is as follows:

"Q. Please state you recollection of the circum-

stances with reference to the execution of a contract which has been filed in this suit for additional compensation to Miss Annie and Mrs. Wood.

"A. After the will was read, Frank Weade made a statement before the heirs that the compensation or special legacy provided for in the will he didn't think was sufficient for Edith and Annie Weade and unless the heirs agreed to give Annie and Edith Weade additional compensation that they would bring out a bill against the estate for the services. Not giving it a thought at that time, the heirs agreed to sign this paper.

"Q. Which is filed in evidence as Exhibit I, J. B. Harner's deposition. You have the contract in your hand. Is your signature to it?

"A. Yes; my signature is to it.

"Q. What is your attitude with respect to this contract?

"A. My attitude to this contract is if I had known it at that time that Edith and Annie Weade couldn't have brought out a bill against the Weade estate, I would never signed it.

"Q. Why then did you sign the contract?

"A. I signed it after Frank Weade made this statement rather than have it go into court.

"Q. Did you or not rely on his statement?

"A. Yes."

Mrs. Mary A. Harner testified:

"A. I was present. Frank told us that they drew the paper up and Frank said that if we didn't sign it the girls would bring an account against the estate.

"Q. What then took place?

"A. Well, I signed the contract because he told us it would sweep everything if they brought out this account and that is why I signed it.

"Q. Was that the moving consideration for signing of this contract by the heirs?

"A. I guess so.

"Q. In other words, I mean, Mrs. Harner, was Mr. Frank Weade's statement what prompted you and the others to sign the contract which has been offered in evidence?

"A. That is what prompted me.

"Q. Did you or did you not receive any consideration whatsoever for signing the contract?

"A. No, sir."

It is further disclosed by the record, in the testimony of Mrs. Lena M. Coyner (one of the signers of the agreement, who is opposed to its repudiation), that all of the parties agreed that the so-called codicil should be considered a part of the will, and pursuant to its terms, Annie and Edith should derive the benefit intended by their father. In this connection we again quote from *Moore* v. *Gregory, supra:*

"The contracts under consideration are not prohibited by the principles of the law, nor do their provisions offend against recognized rules of morality.

"The nature of the contract is clearly one in which a family of a decedent believing his desires with reference to his property were not as expressed in his last will and testament, and being desirous that it should descend and pass as indicated by his last utterances on the subject—his written will to the contrary notwithstanding—agreed in family conference to give validity to his last unenforceable wish, and these contracts of December 3rd and 15th are the results of that family conference. It was clearly and unmistakably a family settlement."

With the exception of the statements of appellants, that Frank Weade misrepresented their legal rights,

there is not a scintilla of evidence that appellants were induced by coercion or fraud to sign the agreement entered into. In the absence of fraud and in view of the manifest intention of the parties to settle all family disputes amicably, and to carry into effect the intention of the testator, we are of opinion that the first assignment of error is without merit.

The second assignment of error calls in question the action of the chancellor in refusing to decree a judgment against the executor for rents and profits. This contention of appellants is fully met in the exhaustive report of the commissioner, R. E. R. Nelson, an able and experienced lawyer, whose report received the sanction of the trial court. There it is said:

"As to the matter of rents and profits your commissioner is of the opinion that the executor cannot be held further than what he has accounted for. It appears from the evidence, and indeed it is a fair inference from the very terms of the will itself, that the testator intended that his two unmarried daughters should have the use of the farm for two years after his death as a home, free from any charges. It appears that this was the interpretation put upon it by most if not all of the children.

"In view of the continuing expectation of a sale of the land at any time after these two years had passed, it is believed that the arrangment made with L. L. Wood for the third year, 1925, was not at all unfair or inadequate, and it was certainly very desirable to have someone on the land farming it and keeping it in condition for market, although under an uncertain tenure. It would have been difficult even to persuade a stranger to take it on better terms under the uncertainty.

"The contracts made for 1926 and 1927 were by no means unusual in their terms—'one half for the other.'

The witnesses put the rental value of the place at figures running from $250.00 per year up to $580.00. The actual yield was over $300.00 per year, remembering that the tenant paid for the executor some of the expenses that the latter should have paid, and this was taken off in their settlements, while the executor actually received in money $558.78 for the two years' crops.

"Under all the circumstances, your commissioner is of the opinion that the executor cannot be held for further rents and profits."

There is no merit in this assignment of error.

We are of opinion that there is no error in the decree complained of, and the same will be affirmed.

*Affirmed.*