# Richmond

W. H. WREN, ET ALS. v. FLORENCE LEE TATE, ET ALS.

January 16, 1950.

Record No. 3502.

Present, Gregory, Eggleston, Spratley, Buchanan, Staples and Miller, JJ.

The opinion states the case.

*Vernon C. Barker, Henry Roberts* and *Bradley Roberts,* for the appellants.

*Stuart B. Campbell* and *Charles E. Hunter,* for the appellees.

Gregory, J., delivered the opinion of the court.

This case involves the estate of M. B. Tate, a farmer, who owned and operated a large farm in Smyth county, Virginia, and was a partner in Robinson, Tate & Company, a wholesale grocery concern in Lynchburg, Virginia. He also conducted an extensive mining business in Southwest Virginia. Tate became financially involved, and on January 11, 1892, conveyed all of his personal property to James D. Tate, his son, and John H. Shuff, as trustees, for the benefit of his creditors. The took charge of the property and administered it.

M. B. Tate died on August 2, 1892, testate, leaving his widow, Amelia, his son, James D. Tate, and a daughter, Millie Belle Shuff. Another daughter, Rosa C. Wren, predeceased the testator. His will was made on the 22nd day of November, 1883, and there were two codicils which are unimportant here. It was admitted to probate on September 19, 1892, and James D. Tate, the son, one of the three named executors, qualified as such and gave bond for $20,000. The other two named executors declined to qualify.

In the trust deed executed for the benefit of his creditors the interest of M. B. Tate in the Lynchburg partnership of Robinson, Tate & Company was not mentioned in express terms. If it was assigned therein it was done in general terms.

Mrs. Wren died on June 17, 1891, predeceasing her father by some ten months. She left surviving her five infant children, as follows. Beverly T., William H., James Harold, Joseph Robert, and Edith Gwyn. The father of these children died on November 15, 1894. He had also been a partner in Robinson, Tate & Company until December 24, 1891, but due to financial troubles he transferred his interest

to M. B. Tate, and removed from Lynchburg, remaining away until his death.

Under the will M. B. Tate made provision for his widow, leaving the home place containing 1,000 acres to her for life, $5,000 in money, $1,000 in stock on the farm, and the Pierce Furnace property.

Rosa Wren was left a life estate in some 600 acres of land, with remainder to her children. She was also left the interest of M. B. Tate in the Lynchburg partnership of Robinson, Tate & Company, subject to the payment of two legacies therefrom, one of $10,000 to James D. Tate, and one of $5,000 to Amelia Tate. The remainder in these properties, after the expiration of her life estate, was devised and bequeathed to her five children, the appellants. She having predeceased the testator, her five children stepped up into her place and succeeded to her rights in the devises and bequests, subject to the legacy of $10,000 to James D. Tate and the $5,000 legacy to the widow of M. B. Tate, charged against the interest in Robinson, Tate & Company.

James D. Tate was given a number of properties, and made the residuary devisee subject to the debts of the testator.

One of the contentions in the present suit which was brought by the appellants is that they were the owners of the M. B. Tate interest in the firm, and upon the satisfaction of the debts due by M. B. Tate, which was fully accomplished in 1906, they became entitled therto, and that the firm having become largely liquidated they are entitled to all of the liquidating dividends that were paid James D. Tate, amounting to some $53,150, together with interest thereon. Whether the two legacies were paid from the Robinson-Tate interest the evidence fails to disclose.

The defendants, the administrators of James D. Tate, who died in 1941, and individually, contend that M. B. Tate gave this interest in the firm to his son before he died, therefore it did not pass under M. B. Tate's will; that the son moved to Lynchburg in 1890 and became a partner in

the firm, and from that time until his death in 1941 he treated that interest in the firm as his own, and that during all those years the complainants made no protest or objection, and asserted no claim to the said interest. They also contend that by the lapse of time their plea of laches and the statute of limitation is a complete defense to this claim of the appellants.

The other point involved in this suit is whether or not James D. Tate set up a parol trust in favor of the appellants in a portion of the residuary lands of M. B. Tate. They alleged in their petition that in August, 1912, in which year Mrs. Amelia Tate had previously died, they met with James D. Tate at his home, where they say this took place: "Col. Tate says to the Wrens, * * * 'Now that you all are here and Ma has passed on I want to tell you something of your affairs. Your grandfather's estate is involved to the extent of some $34,000, which is a lien against the estate and a lien against your land. I now have this lien in my hands. I have sold some standing timber off your land to Cole and Fry, and a tract of your land to Frazier. I think if you boys agree to it, I will just accept what monies I got and release your land from any lien of an sort.'

"At this point Will Wren spoke up and said: 'According to our grandfather's will, that Rye Valley property (residuary lands) was to be sold first to pay debts.'

"* * * Col. Tate proceeds * * * 'It is true that the will provides for the sale of the Rye Valley property first to pay the debts, but this is no time to sell it. If it is ever sold an adjustment with you will be made, you will eventually get anything that is coming to you.'

"Col. Tate continues: 'I have attended to all your affairs from your earliest infancy and will continue to do so right on. I promised your grandmother that I would do such a thing and take care of you and your interests. I have managed this estate very well. I know how to manage it. If you boys go along with me it will be continued to your

advantage, because you are going to get the whole thing any way.'

"Col. Tate continues:   * * * 'You all ought to trust me to continue the management of your financial affairs.  If you boys go along with me, eventually it will be yours any way, and your future, your financial welfare, will be far better served than if you try to manage it yourself or fail to let me go ahead with it.  In case you need money I will come to your assistance, but young folks should make their own way, and I don't want to be bothered with demands unless they are very necessary, and I recommend that whatever help I give anyone that they pay it back, so as to keep the estate intact.'

"At this point Beverly T. Wren, the oldest of the Wrens, said:  'I think Uncle Jim's right.  He should continue to manage this affair, particularly as it is Grandma's wish and since he has already always done it.'

"Col. Tate replies by asking:   'Very well, is it agreed?'

"To which all the Wrens said:   'Oh, yes; yes, sir.'"

In the foregoing conversation nothing was said about the M. B. Tate interest in the firm of Robinson, Tate & Company.

The petitioners contend that from the conversation on that occasion, to which all of them testified, an express continuing parol trust in the Rye Valley lands, a portion of the residuary devise of M. B. Tate, was created by James D. Tate in their favor.

The defendants deny that any parol trust was ever created, and say that if it were, a subsequent writing of November 25, 1912, signed by all of the appellants, who at that time were all of age, and by James D. Tate, was a complete settlement between them, and that it amounts to a complete denial of the alleged trust.  This writing is as follows:

"IT IS AGREED between James D. Tate and B. T. Wren, W. H. Wren, J. H. Wren, J. R. Wren, and Edith G. Wren, that the money said Tate received from the sale of some timber to Cole & Fry a few years ago, off the land

willed to them by the late M. B. Tate, and also the money realized from the sale of a part of the Byars or Baugh place to J. T. Frazier in 1908 (which money was held by the Receiver in the Chancery cause of Amelia Tate, Guardian, etc. v. J. Harold Wren, et als., pending in the Circuit Court for Smyth County, Virginia) is to go to James D. Tate in full settlement of any and all liability that may rest on the Wrens land for a debt due the same James D. Tate by the estate of M. B. Tate, per decree of the Circuit Court for Smyth County, Virginia, entered April 30, 1904, or any other decree in said case. And James D. Tate accepts this money in full settlement as above stated, and agrees to release the lien created by said debt from the Wrens land whenever necessary for a sale of it or any part thereof. The Wrens have no further interest in said debt or its payment, but Tate is to look solely to the other lands of M. B. Tate's estate for the payment of the debt, and is not to be held accountable to the Wrens for its payment, Tate thus becoming the sole owner of all the other lands of which M. B. Tate died seized wherever located. This is intended to be a full and clear release, so far as this debt is concerned, from Tate to Wrens and from Wrens to Tate.

"IT IS FURTHER AGREED between Tate and Wrens that if a sale of the whole or any part of the Wrens land that came to them through M. B. Tate's estate, or that was deeded to them by James D. Tate, in exchange, per deed of even date, is to be sold, then the Wrens agree to give Tate the refusal of said land at same price and terms that may be offered by others.

"THE PARTIES hereto agree to execute such other papers as may be necessary to carry out the provisions of this agreement.

"Given under our hands and seals this the 25th day of November, 1912." (Then follow the signature and seal of each party.)

It is very significant that the interest in the firm of

Robinson, Tate & Company which belonged to M. B. Tate was not taken into consideration in the contract.

The issues here are two-fold. (1) Did the appellants take the interest in Robinson, Tate & Company under the will of M. B. Tate, and is so, have they lost it by their laches?, and, (2) Have the appellants established the parol trust in the Rye Valley lands or the proceeds therefrom asserted by them? The chancellor decided both issues adversely to the appellants.

We will first discuss and decide the claim of the petitioners to the Robinson-Tate interest which they claim came to them through the bequest of M. B. Tate to their mother, Rosa C. Wren, and through her to them.

James D. Tate moved to Lynchburg in 1890, and became a partner in Robinson, Tate & Company. Under his father's will he had been left a legacy of $10,000 to be paid from the interests in the firm. There is no evidence that the legacy was paid, or of his having bought an interest in the firm. The interest he had must have come from his father, M. B. Tate. There is no evidence that it came from the other partners. There was no written instrument evidencing the manner in which he acquired his interest. A witness named Gorman, who was 80 years old when he gave his deposition in 1944, said he had been employed by the firm since 1884 and that he remembered when J. D. Tate became a partner in the firm. He stated that it was prior to the death of M. B. Tate, but that he could not fix the exact time. These questions were asked him, to which he made the following replies:

"Q. You don't know how James D. Tate got his interest in the partnership?

"A. Oh, yes, his father transferred his interest to him before his death because he wanted him to have his interest in the business and wasn't any entries or anything made about that except James D. Tate was recognized as the owner of the interest that M. B. Tate had. That is my recollection of the way it was fixed.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

"Q. Did I understand you to say that Major M. B. Tate said that he wanted James D. Tate to have the interest that he had in it?

"A. That is what W. H. McLaughlin, who was running the concern, told me at the time; that he wanted to give his interest to James D. Tate. That is my recollection of what happened. I haven't got any records on that. I am going by my recollection. At any rate, Mr. M. B. Tate didn't taken any interest in anything done about the concern. We consulted James D. Tate instead of M. B. Tate."

In 1900 the firm was incorporated for $35,000 and James D. Tate was issued 100 shares of the capital stock which represented his former interest in the firm. This was about one-third of the entire capital stock. Later his holdings in the corporation were increased to 45 per cent. The youngest of the Wren children was twenty-one years of age in January, 1912. For about thirty years after all were of age, and until three years after the death of James D. Tate, they failed to assert any right to this interest in the Robinson-Tate Company.

James D. Tate had taken possession of this interest in 1890, about two years before the death of his father, exercised his ownership over it, incorporated the firm in 1900, and in the deed of the buildings to the corporation, executed by himself and his partners, he solemnly stated in one of the recitals that M. B. Tate in his lifetime had transferred to him his entire interest in Robinson, Tate & Company. From 1890 until 1941, when he died, his ownership was never challenged. He held this interest as his own for some fifty-one years.

It is not shown that James D. Tate took possession of the interest in the firm under the deed of assignment of 1892. This interest was not specifically mentioned therein. He had already been in possession for two years before the deed of assignment was made.

Likewise, there is no showing that Tate took over this

interest as executor of his father's estate. He had the interest in his possession claiming ownership to it two years before his father died. That his father wanted him to have a substantial interest in the firm is evidenced by the legacy of $10,000 left him in the will, to be paid from the firm. This amount almost equaled M. B. Tate's interest in the firm.

Another significant circumstance which tends to support the claim that James D. Tate was the owner of the interest in the firm is the failure of the appellants to mention this interest in their conversation of August, 1912, and the failure to consider it in the written contract of November, 1912. They knew of the provisions of the will of M. B. Tate. One of them had a copy of it. They must have known of the bequest of this interest to their mother, yet they did not mention it in this final settlement. If Tate was the owner, and it was given him by his father in the latter's lifetime, no mention would have been made of it.

In an effort to counter the defendant's evidence, it was shown that J. D. Tate, as executor of his father's estate, was required to execute a bond for $20,000, and that unless the Robinson-Tate interest was taken into consideration as a part of the personal property of the M. B. Tate estate, such a large bond would not have been required, as the other property would not have justified it.

This circumstance, in our opinion, does not weaken the testimony of the defendants which tends to show that J. D. Tate had acquired the interest in the Robinson-Tate Company prior to the death of his father. It is not clear of what the personal property of the M. B. Tate estate consisted in 1892.

It is also said that a bill filed by Kean, receiver, in the Circuit Court of Campbell county in the suit of Bolling and wife v. Robinson, in September, 1894, to which bill James D. Tate was made a party defendant, contained an allegation to the effect that the interest in Robinson, Tate & Company was an asset of the estate of M. B. Tate, and that

the failure of James D. Tate to answer the said bill was an admission on his part that the allegation was true.

It is a fact that James D. Tate was made a party defendant and that he did not answer the bill. It is also a fact that the bill was taken for confessed as to him. However, this fact would not be conclusive that James D. Tate was not the owner of the interest in 1894.

We are of opinion that James D. Tate acquired his father's interest in Robinson, Tate & Company before the latter died, and therefore it did not pass under the latter's will to the appellants.

The remaining question to be decided is whether or not the petitioners have alleged and proven an express parol trust whereby James D. Tate promised to turn over to them a portion of the residuary lands known as the Rye Valley land which had to be first sold under M. B. Tate's will to pay debts.

This land in 1918 was sold by J. D. Tate for $100,000, but not to pay debts. He sold it in his own right, he having previously paid all of the debts of his father. At the time it was thought that it contained deposits of manganese which was badly needed in the conduct of the first World War. After the sale it turned out that the property was of little value, and it was finally sold to the Federal Government for $3,000. The petitioners claim that they are entitled under the alleged parol trust agreement to the $100,000 paid to James D. Tate, together with interest thereon.

James D. Tate, as executor, had paid all of the debts of the M. B. Tate estate from his own personal funds. The debts amounted to more than $34,000, and Tate had taken a judgment against the estate for that amount. The judgment was a lien on all of the lands of the estate, including the 600 acres which went to the five appellants. M. B. Tate had provided in his will that his debts should be paid from his residuary lands and that if any property had to be sold it should be the Rye Valley land, a part of the residuary. James D. Tate was the residuary devisee. He had been

very much interested in the welfare of the appellants, and had sold some of their land and some timber for them. He had the proceeds. He was their uncle, and has been described as "a father to them". He managed their affairs profitably to them from the time of M. B. Tate's death. They were infants and orphans, and Tate's mother became their guardian and reared them. She died in 1912, and after her funeral, while all of the appellants were gathered at Tate's home, they had a conference concerning their affairs. They had all become of age, and then it was that the conversation previously set out took place. This was in August, 1912.

The appellants contend in substance that James D. Tate verbally promised at that meeting "that since in the end you boys will have everything you should go along with me and my mother's wish and let me manage it." And speaking of the Rye Valley land they testified that Tate said, "it is true that the will provides for the sale of the Rye Valley property first to pay the debts, but this is no time to sell it. If it is ever sold an adjustment with you will be made. You will eventually get anything that is coming to you." The appellants contend that they accepted the proposition and agreed to allow Tate to manage their property on the faith of his promise, and that he did not carry it out.

Later, on November 25, 1912, Tate sent the contract of that date to them, and they signed it. The contract is clear and its meaning is not difficult to understand. It is self-explanatory. It amounted to a complete settlement between Tate and the appellants. Nothing was left open. The Robinson-Tate interest was not embraced in the contract because M. B. Tate had transferred it to his son, James D. Tate, before he died. The parties from that time on have abided the terms of the contract. That got all of the lands to which he was entitled, and the appellants got the lands left them by the M. B. Tate will, free of the large indebtedness of the M. B. Tate estate.

From 1912 to 1941, when James D. Tate died, not one

of the appellants indicated at any time that he was not satisfied with the terms of the written contract or that he was not bound by it.

For nearly thirty years they slept upon their rights, saw Tate use and exercise all of the elements of ownership over the real estate that went to him under the agreement, knew he sold the Rye Valley land in 1918 as his own, accepted the provisions made for themselves under the agreement, and only after Tate's death did they make any protest.

That an express trust in land may be created by parol is not an open question in Virginia. *Virginia Trust Co.* v. *Minar*, 179 Va. 377, 384, 18 S. E. (2d) 879, and *Ingles* v. *Greear*, 181 Va. 838, 840, 27 S. E. (2d) 222.

A parol trust must be established by those asserting it by explicit, clear and convincing evidence. The declaration of trust relied upon must be unequivocal. *Ingles* v. *Greear, supra.*

After reading the entire record it is not clearly shown that the parties mutually agreed and intended that a parol trust was to be created by the conversation of August, 1912. The terms of the alleged trust are too indefinite. James D. Tate was a careful and prudent business man who was meticulous in attending to affairs relating to his property. One would not assume that a man of his business capacity intended, from the conversations relied upon, which were only negotiations, to give all of his lands to the appellants, even though he might have said that "in the end it will be yours any way".

It is contended that Tate occupied a fiduciary relationship to the appellants, and that he was charged with exercising the utmost good faith toward them in connection with their interest in the estate. No doubt he was greatly interested in the appellants and it was his desire to help them in any way he could, but at the time of the November, 1912, written contract it was clear that the parties were dealing at arm's length, and that all of them knew what they were doing when they signed it. No fraud or undue influence

was charged, and it is not contended that Tate took advantage of the appellants. There is nothing upon the face of the written contract which would indicate that it was unfair to them. If there was a fiduciary relationship it was terminated when the agreement of November, 1912, was made. They knew then that Tate was holding his lands as his own and not as trustee for them.

In addition to what has been said, it seems to us that the defense of laches constitutes a complete bar to the assertions now being made by the appellants. After sleeping on their rights for nearly thirty years after the contract was made, with knowledge of their rights, and after the death of Tate, they, for the first time, when they institute this suit, assert the rights they now claim. It is too late for them to do so. *Weade* v. *Weade*, 153 Va. 540, 150 S. E. 238; *Milligan* v. *Milligan*, 145 Va. 184, 133 S. E. 672; *Hagan Estates* v. *New York Min., etc., Co.*, 184 Va. 1064, 37 S. E. (2d) 75, and *Farish* v. *Wayman*, 91 Va. 430, 21 S. E. 810.

If we were to uphold the trust theory of the appellants, we would set at naught the solemn written contract of November, 1912, admittedly entered into by all of them free from undue influence or fraud, a contract that is obviously fair upon its face, certain and definite in its terms and founded upon an adequate consideration, and some thirty years afterwards establish the so-called parol trust on the doubtful testimony of the five appellants. The testimony is not clear, unequivocal and convincing. We are not informed whether by its terms the appellants were to get all or only a part of the M. B. Tate estate, as well as all of the James D. Tate estate. However, it is now conceded that the trust would only operate upon the funds derived from the Rye Valley lands and the dividends from Robinson, Tate & Company.

James D. Tate died in 1941 intestate. He left surviving his widow, Florence Lee Tate, and the five appellants. He left a large estate consisting of personalty and realty. His personalty passed under the statute of descents to his widow,

and his realty, subject to the dower rights of the widow, descended to the appellants who were his only heirs. They afterwards acquired the dower rights and have long since disposed of the lands. They received all that they were entitled to receive as heirs of James D. Tate, and since 1912 they have had, free of debt, all of the lands which M. B. Tate left them under his will except those lands which they agreed to sell.

We are of opinion that the case has been correctly decided and that the decree should be affirmed.

*Affirmed.*